******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

PALMER, J., with whom McDONALD, J., joins, concurring in the judgment. In *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011), a narrow majority of this court concluded that, when a trial court has afforded defense counsel a meaningful opportunity to review its proposed jury instructions, and when, in the course of an on-the-record charging conference, defense counsel agrees with or simply acquiesces in[1] those instructions, an appellate court will not later review an unpreserved claim that the instructions violated the constitutional rights of the defendant. See id., 482–83. The stated rationale for carving out this unique exception to *Golding*[2] review was that a defense counsel who acquiesces in the proposed instructions may be deemed to have implicitly or impliedly waived, on behalf of the defendant, any objections thereto. See id., 483.

Constrained by centuries of precedent, the majority in *Kitchens* was forced to acknowledge that a person executes a waiver only when he intentionally and voluntarily chooses to relinquish a known right. Id., 469. This same standard applies regardless of whether the waiver is implied (by conduct) or express (verbal), and, indeed, the state bears an especially high burden of proof when seeking to establish that a criminal defendant has waived by implication one of his fundamental constitutional rights. See part I B of this opinion. In seeking to justify its new rule, then, the *Kitchens* majority faced a conundrum: on what basis can we conclude that any defense counsel who merely acquiesces in an incorrect jury instruction has knowingly and voluntarily chosen to waive her client's right to a properly instructed jury, when it is at least as likely that, in the "the hurried and . . . hectic process of trial"; *People* v. *Ladas*, 12 Ill. 2d 290, 294, 146 N.E.2d 57 (1957); she simply failed to identify the defect later claimed on appeal?

*Kitchens*' initial solution to this conundrum was to take refuge in what the majority in that case conceded was a pure "legal fiction," namely, the presumption that a defense counsel who reviews and then acquiesces in the trial court's proposed instructions has considered and declined to raise every potential objection to every part of the instructions. (Internal quotation marks omitted.) *State* v. *Kitchens*, supra, 299 Conn. 487 n.25. This legal fiction justification for the *Kitchens* rule was illogical and unfounded from the start, and, to their credit, both the state and the majority in the present case now appear to have disavowed it. In its stead, however, they have set an equally implausible rationale, namely, that each defense counsel, upon reviewing the trial court's proposed jury charge, knowingly and voluntarily waives her client's procedural right to later challenge those instructions on appeal.

Unfortunately, this new theory fares no better than *Kitchens*' original legal fiction theory. There is a strong presumption against a finding of waiver, especially with respect to the constitutional rights of criminal defendants, and waiver—whether substantive or procedural—can be found only when there is unambiguous evidence that the defendant, with full understanding of his rights, actually intends to waive them. Each of these principles is black letter law, and each is deeply and firmly rooted in the law of this state. The *Kitchens* rule violates all of them. To jettison these well established rules, merely to achieve a desired policy outcome, is to place at risk not only our *Golding* jurisprudence, and the fundamental rights of criminal defendants, but all of the other branches of the law in which the concept of waiver plays a significant role.

Rather than adding epicycle upon epicycle in a futile attempt to salvage the unprecedented and unnecessary *Kitchens* rule, we should admit the obvious. Descriptively, mere acquiescence, without something more, simply does not meet the high standard our law imposes for establishing a waiver of a defendant's constitutional rights. Normatively, the policy arguments that appear to animate these continued efforts to undercut our well established *Golding* jurisprudence are untested and unpersuasive. I therefore agree with the defendant, Brandon Montrell Bellamy, that *Kitchens* should be overruled as a failed experiment and that we should return to our pre-*Kitchens* jurisprudence governing the reviewability of unpreserved claims. See part I of this opinion. Specifically, an unpreserved claim that instructional error of constitutional magnitude has occurred should be unreviewable under *Golding* only when (1) defense counsel induced or invited the error, or (2) it clearly can be inferred that counsel—or the defendant—actually was aware of the alleged defect in the instruction but chose for strategic or other reasons not to object (true waiver).

Although I conclude that the defendant's unpreserved claim of instructional error was not waived under the proper legal standard, I do agree with the state that the claim is unreviewable under *Golding* because the alleged error is not of constitutional magnitude. See part II of this opinion. For this reason, I concur in the judgment.

## I

## *KITCHENS* SHOULD BE OVERRULED

Although the court in *Kitchens* was not always clear or precise in its use of the term "waiver," I understand the *Kitchens* rule—that the defendant implicitly waives the right to raise unpreserved claims of instructional error on appeal—to encompass both a descriptive element (it purports to describe the defendant's actual conduct) and a normative element (it tells us what the

legal consequences of that conduct should be). See 28 Am. Jur. 2d 503–504, Estoppel and Waiver § 37 (2011). Descriptively, the court in *Kitchens* posited that acquiescence under the conditions outlined in that case supports an inference that defense counsel did in fact knowingly and voluntarily relinquish any and all challenges to the proposed instructions. See *State* v. *Kitchens*, supra, 299 Conn. 483–85. Normatively, the court concluded that, for various reasons of public policy, it is desirable and appropriate to treat such challenges as waived and unreviewable on appeal. See id., 486–98. Both of these conclusions are indefensible.

In this part of the opinion, I explain the three fundamental flaws in the *Kitchens* rule, both as originally rationalized in *Kitchens* and as reconstituted by the state in the present case: (1) it represents a dramatic departure from our prior *Golding* jurisprudence; see part I A of this opinion; (2) descriptively, it is predicated on an illogical and fictitious account of what actually happens when defense counsel acquiesces in the trial court's jury instructions; see part I B of this opinion; and (3) normatively, it carves out an unwarranted exception to *Golding* review for instructional errors on the basis of untested and unpersuasive policy arguments. See part I C of this opinion. I also explain how the *Kitchens* rule easily can be defeated; see part I D of this opinion; and why I am not persuaded by the state's argument that stare decisis requires that we retain the *Kitchens* rule despite these serious defects. See part I E of this opinion.

## A

### *Kitchens* Overturned and Confused Our *Golding* Jurisprudence

In *Kitchens*, the stated goal of the majority was to clarify Connecticut law on implied waiver, particularly with respect to jury instruction challenges. *State* v. *Kitchens*, supra, 299 Conn. 474. Unfortunately, by misconstruing our *Golding* jurisprudence in order to reach a desired policy outcome, *Kitchens* failed to achieve that goal, and the majority in the present case has simply made matters worse. In addition, muddled and inconsistent use of key terminology, both in the present case and in *Kitchens*, has left reviewing courts without adequate guidance when addressing such claims.

### 1

### *Kitchens* Misstated and Departed from Our *Golding* Jurisprudence

I recognize that the question of whether a defendant has waived his constitutional rights hinges to some degree on the unique facts and circumstances of any given case. Nevertheless, our cases addressing the reviewability of unpreserved claims of instructional error divide fairly readily into three general categories.

First, at one end of the spectrum, are those cases in which defense counsel sits silently by as the court instructs the jury, with counsel giving no indication whether she objects to or agrees with the court's instructions. See, e.g., *State* v. *Kurvin*, 186 Conn. 555, 557, 563–64, 442 A.2d 1327 (1982). Although run-of-the-mill claims of instructional error are forfeited if not timely raised at trial and, therefore, are not reviewable on appeal, there is general agreement that such conduct by counsel does not constitute an implied *waiver* of unpreserved claims of constitutional error.[3] See *State* v. *Kitchens*, supra, 299 Conn. 483 n.23. Accordingly, such claims are reviewable on appeal if the *Golding* requirements are otherwise satisfied. See id.

Second, at the other end of the spectrum, is a broad class of cases in which something in the record indicates either that defense counsel has knowingly and voluntarily waived, on behalf of the defendant, the particular objection at issue on appeal (true waiver), or that she has induced or invited the instructional error that is subsequently challenged on appeal. We have found true waiver both when defense counsel expressly waives the objection at issue,[4] and in various situations in which the only reasonable inference is that counsel actually intends to waive the objection (implied waiver). This court or the Appellate Court has found implied waiver, for instance, when it is clear from the record that defense counsel actually was aware of the alleged instructional defect but declined to object or agreed to a curative instruction and thus impliedly waived any objection,[5] and also when the trial court record strongly suggests that defense counsel declined to object to a particular instruction for identifiable strategic reasons.[6] Similarly, we have found induced or invited error under three circumstances: (1) when counsel drafts for the court the instructions later challenged on appeal;[7] (2) requests that the trial court draft or reiterate the challenged instruction;[8] or (3) adopts the challenged instruction, or the legal principle on which it is based, as a component of the defense theory.[9] Although the majority in *Kitchens* contended that we did not rely on the concepts of induced or invited error in cases of the latter two types; see id., 469–70, 472; that clearly is not true. Several of the cited cases, while also using the general term "waiver," expressly refer to the alleged error as one that was induced or invited by the defendant. See, e.g., *State* v. *Fabricatore*, 281 Conn. 469, 481–83 and n.18, 915 A.2d 872 (2007); *State* v. *Cooper*, 38 Conn. App. 661, 670, 664 A.2d 773, cert. denied, 235 Conn. 908, 665 A.2d 903 (1995), cert. denied, 517 U.S. 1214, 116 S. Ct. 1837, 134 L. Ed. 2d 940 (1996); see also *State* v. *Scognamiglio*, 202 Conn. 18, 25, 519 A.2d 607 (1987). Moreover, in each cited case, we relied on the fact that counsel not only declined to object to the instruction at issue, but also actively requested the sort of instruction later challenged on appeal or some-

how adopted the principle of law on which it was predicated. See footnotes 8 and 9 of this opinion. Indeed, legal scholars have long classified under the rubric of induced error not only cases such as *State* v. *Coward*, 292 Conn. 296, 305, 972 A.2d 691 (2009), and *State* v. *Cruz*, 269 Conn. 97, 105, 107, 848 A.2d 445 (2004), in which the appellant drafts or requests the actual challenged instruction, but also cases in which the appellant either requests that the court give an instruction of that sort; see W. Maltbie, Connecticut Appellate Procedure in the Supreme Court of Errors of Connecticut (2d Ed. 1957) § 96, p. 117 and n.16; or invokes the contested rule of law; see id., § 40, pp. 45–46; see also *State* v. *Akande*, 299 Conn. 551, 560, 11 A.3d 140 (2011) (implicitly recognizing that *State* v. *Foster*, 293 Conn. 327, 977 A.2d 199 [2009], was case of induced error).

As to this second category of cases, I am in complete agreement with the majority that, if defense counsel either (1) induces or invites the claimed error, or (2) truly and unequivocally waives any objection, with the possible exception of plain error, the claim is not reviewable on appeal, even if the error is of constitutional magnitude. The rationale for the rule that a party who induces or invites an error cannot be heard on appeal to complain about that error is essentially one of unclean hands: "[t]o allow [a] defendant to seek reversal [after] his trial strategy has failed would amount to allowing him to induce potentially harmful error, and then ambush the state [and the trial court] with that claim on appeal." (Internal quotation marks omitted.) *State* v. *Cruz*, supra, 269 Conn. 106; see also *Gaffney* v. *Board of Trustees of the Orland Fire Protection District*, 969 N.E.2d 359, 368 (Ill. 2012) ("it would be manifestly unfair to grant a party relief based on error introduced into the proceedings by that party"); *Tenbusch* v. *Linn County*, 172 Or. App. 172, 177 n.6, 18 P.3d 419 (induced error doctrine guards against strategic gaming of judicial system), review denied, 332 Or. 305, 27 P.3d 1045 (2001).

The doctrine of waiver, by contrast, is animated largely by the principle of respect for autonomy.[10] As one scholar has explained, "once the defendant has made a free and informed decision to forgo his constitutional defenses, he may constitutionally be held to the consequences of his election." P. Westen, "Away from Waiver: A Rationale for the Forfeiture of Constitutional Rights in Criminal Procedure," 75 Mich. L. Rev. 1214, 1254–55 (1977). In addition, the principle of judicial estoppel[11] underlies the doctrines of both waiver and induced error. See *S.H.V.C., Inc.* v. *Roy*, 188 Conn. 503, 510, 450 A.2d 351 (1982). By contrast, the rationales on which the state relies—the finality of criminal convictions, fairness to the trial court and the state, and incentivizing diligence by defense counsel at a time when errors can still be corrected—apply equally to types of claims other than instructional errors. In *Golding*, we

made a determination that those considerations are outweighed by the principle that a criminal defendant, at risk of life and liberty, should not be wrongly deprived of his fundamental constitutional rights due to the inadvertence of defense counsel. See *State* v. *Brunetti*, 279 Conn. 39, 55, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007); see also part I C of this opinion.

The only category of cases over which I disagree with the majority with respect to the reviewability of unpreserved claims is the third category of cases, namely, those in which defense counsel vocalizes that she has no objection to, is satisfied with, or agrees to the court's instructions, but does not otherwise waive her client's right to object or induce the claimed error by drafting, requesting, or adopting the challenged instruction. Prior to *Kitchens*, we consistently held that claims of this sort are reviewable on appeal if they otherwise satisfy the four *Golding* requirements.[12] I am not aware of any pre-*Kitchens* case—and the majority is unable to cite any—in which this court presumed waiver solely on the basis of defense counsel's acquiescence in the trial court's draft instructions. Although the majority in *Kitchens* maintained that we found waiver by acquiescence in cases such as *State* v. *Hampton*, 293 Conn. 435, 450, 988 A.2d 167 (2009), *State* v. *Foster*, supra, 293 Conn. 342, *State* v. *Holness*, 289 Conn. 535, 542, 958 A.2d 754 (2008), *State* v. *Brewer*, 283 Conn. 352, 353, 927 A.2d 825 (2007), and *State* v. *Fabricatore*, supra, 281 Conn. 481; see *State* v. *Kitchens*, supra, 299 Conn. 471–72; in reality, each of those cases featured significant additional indicia of either true waiver or induced error.[13] See *State* v. *Ebron*, 292 Conn. 656, 680–82, 975 A.2d 17 (2009), overruled in part on other grounds by *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011). The *Kitchens* rule thus represents a novel and, as I explain more fully hereinafter; see part I C of this opinion; wholly unwarranted departure from our well established *Golding* jurisprudence with respect to this third category of instructional error cases.[14]

2

*Kitchens* Failed To Provide Clear Guidance

One flaw in *Kitchens*, then, is that the majority in that case, like the majority in the present case, failed to properly distinguish between (1) cases in which defense counsel merely acquiesced in the trial court's proposed jury charge, and in which we traditionally found unpreserved constitutional claims reviewable under *Golding*, and (2) cases in which counsel actively induced or knowingly and voluntarily waived objections to the charge at issue, and in which we found unpreserved claims unreviewable under the third prong of *Golding*. A second, related flaw is that the majority in *Kitchens* further muddled these distinctions and failed to provide the reviewing court with clear guidance by using key

terminology in a misleading and inconsistent manner. Perhaps the best (or worst) example of this is the court's inconsistent use of the term "acquiescence."

Descriptively, the majority in *Kitchens* described as acquiescence everything from defense counsel's sitting silently by and failing to object to the court's jury charge, to defense counsel's expression of affirmative satisfaction or agreement with the charge. Compare, e.g., *State* v. *Kitchens*, supra, 299 Conn. 476 n.20 (equating acquiescence with mere awareness of and failure to object to instruction at issue), with id., 478–79 n.21 (referring to counsel's expressed satisfaction with instructions as acquiescence); see also id., 466, 480, 482 (referring to conduct in *Kitchens* as example of acquiescence). Of greater concern, *Kitchens* provided diametrically opposed guidance as to the legal consequences that follow from a finding that defense counsel acquiesced in the trial court's proposed jury instructions. Compare id., 483 n.23 ("[t]he standard that we describe would not allow waiver to be presumed . . . from defense counsel's mere acquiescence in, or failure to object to, the jury instructions"), with id., 494–95 n.27 (acquiescence is presumed to be tactical and, therefore, results in waiver).

Similarly, although the court in *Kitchens*, and the majority in the present case, repeatedly reassures us that defense counsel implicitly waives jury instruction challenges only by "affirmatively" accepting the trial court's proposed instructions; id., 482–83; see id., 496; see also footnote 9 of the majority opinion; in the same breath, the majority cautions that counsel's mere acquiescence will result in waiver, even though that acquiescence, by definition, entails passive rather than affirmative acceptance. See Black's Law Dictionary (10th Ed. 2014) p. 27 (defining "acquiesce" as "[t]o accept tacitly or passively; to give implied consent"); Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) p. 11 (defining "acquiesce" as "to accept, comply or submit tacitly or passively"); see also *Aguilar Gonzalez* v. *Mukasey*, 534 F.3d 1204, 1209 (9th Cir. 2008) ("[a]cquiescence is not an affirmative act"); *State* v. *Devalda*, 306 Conn. 494, 508, 50 A.3d 882 (2012) ("acquiescence . . . commonly is understood to be a form of consent typified by passivity or lack of protest, rather than active agreement" [emphasis omitted; footnote omitted]).

If the majority is committed to retaining the *Kitchens* rule, then it should use this second opportunity to clarify our waiver jurisprudence to provide clearer guidance as to what sorts of conduct by defense counsel will and will not be deemed to constitute an implied waiver. Moreover, the majority should have the courage of its convictions with respect to *Kitchens*. If waiver is to be found only in cases in which there is an actual *affirmative* assent, then the majority should clarify that the numerous post-*Kitchens* cases in which defense coun-

sel simply passively acquiesced in the trial court's jury instructions were wrongly decided and that the appellants in those cases were entitled to have their claims reviewed. See, e.g., *State* v. *Akande*, supra, 299 Conn. 559, 562 (finding waiver when defense counsel, given opportunity to object to proposed instructions, merely replied, " '[n]o, Your Honor' "); *State* v. *Brown*, 153 Conn. App. 507, 534, 101 A.3d 375 (2014) (finding waiver merely because "[a]t no time during the charging conference did [defense] counsel challenge the court's instructions on the elements of conspiracy"), cert. granted, 319 Conn. 901, 122 A.3d 636 (2015); *State* v. *Reddick*, 153 Conn. App. 69, 82, 100 A.3d 439 (finding waiver when defense counsel merely "stated that he had no further objection to the draft instructions"), cert. dismissed, 314 Conn. 934, 102 A.3d 85 (2014), and cert. denied, 315 Conn. 904, 104 A.3d 757 (2014); *State* v. *Lee*, 138 Conn. App. 420, 450, 451, 52 A.3d 736 (2012) (finding waiver when defense counsel merely indicated that there were no disagreements as to charge and "voiced no other exceptions or concerns"), cert. granted, 321 Conn. 911, 136 A.3d 644 (2016).[15] On the other hand, if mere acquiescence is now to be the stuff of waiver, then the majority should stop repeating the affirmative assent language, which gives the misleading impression that waiver will be implied only when counsel expresses actual agreement with the trial court's instructions. Call a fig a fig, and tell both the bar and the public how low the standard now is for finding that counsel has, without ever actually agreeing to the court's instructions, extinguished a client's right to raise constitutional claims on appeal.[16]

## B

### *Kitchens* Improperly Conflated Acquiescence and Waiver

In part I A of this opinion, I explained how the court in *Kitchens* misread this court's *Golding* jurisprudence and how, prior to *Kitchens*, we treated unpreserved claims of instructional error as forfeited but not waived when defense counsel merely acquiesced in a trial court's draft jury charge. In this part of the opinion, I explain why the majority in *Kitchens* erred in deviating from that precedent because mere acquiescence, while possibly supporting a finding of forfeiture, will never satisfy the well established standards for an implied waiver of fundamental constitutional rights. In its present attempt to shore up the obvious flaws in *Kitchens*' analysis of the issue, the state has succeeded only in replacing a fiction with a fallacy.

### 1

### Shortcomings of the Original *Kitchens* Rationale

In *Kitchens*, the state argued that a defense counsel who, following a meaningful opportunity to review the

trial court's proposed jury charge, fails to object that the charge is deficient in some particular way, should be deemed to have done so for strategic reasons and, therefore, to have impliedly waived that objection. *State v. Kitchens*, Conn. Supreme Court Records & Briefs, March Term, 2010, State's Brief pp. 21–22. The majority in *Kitchens* largely adopted both the state's proposed rule and the stated rationale for the rule, holding that, "when the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, *the defendant may be deemed to have knowledge of any potential flaws therein* and to have waived implicitly the constitutional right to challenge the instructions on direct appeal." (Emphasis added.) *State v. Kitchens*, supra, 299 Conn. 482–83. In other words, as the majority in *Kitchens* repeatedly emphasized, the *Kitchens* rule was predicated on the theory that competent defense counsel would have been aware of any and all potentially meritorious constitutional objections to the court's proposed charge and, therefore, that counsel's choice not to object must have been intentional and strategic. See, e.g., id., 469 (counsel is assumed to have intended natural consequences of failure to raise known claim); id., 470 (theory of implied waiver is predicated on assumption that failure to raise claim was result of trial strategy); id., 482 (*Kitchens* discussed as example of case in which court "could infer counsel's knowledge of the alleged impropriety"); id., 491–92 (competent counsel may be presumed to have been familiar with governing law and to have exercised professional judgment when waiving potential claims); id., 495 n.27 ("we build on the presumption of competent counsel by presuming that counsel would have identified the instructional error if given a proper and meaningful opportunity to review the instructions"). The court summarized the rationale underlying the *Kitchens* rule as follows: "[I]f counsel had sufficient notice of the jury instructions and was aware of their content, an inference, or assumption of fact . . . can be made that counsel also was aware of any potential constitutional defect that the instructions may have contained and, with full understanding of that defect, opted to refrain from objecting for strategic reasons." (Citation omitted; emphasis omitted; internal quotation marks omitted.) Id., 487 n.25. Notably, although the cited passage suggests that the *Kitchens* rule is based on a *factual* inference[17] that counsel is aware of all potential objections, the majority in *Kitchens* ultimately acknowledged that this so-called inference is nothing more than a "legal fiction." (Internal quotation marks omitted.) Id.

The obvious structural cracks in *Kitchens*' original foundation—both conceptual and practical—have been widely recognized.[18] The term "waiver" has almost uni-

versally been defined as the "voluntary surrender or relinquishment of some known right," or some equivalent expression. 28 Am. Jur. 2d, supra, § 35, p. 501; see also *Johnson* v. *Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938) ("a waiver is ordinarily an intentional relinquishment of abandonment of a known right or privilege"); cf. *State* v. *Kitchens*, supra, 299 Conn. 483. Conceptually, the notion that a factual inference that there has been a knowing and voluntary relinquishment of a fundamental constitutional right can be predicated on a legal *fiction* is at best an oxymoron and at worst a dangerous absurdity. It would be ludicrous, for example, in the closely related context of medical informed consent, to suggest that a physician who performed elective surgery without informing a patient of the various risks involved could justify the omission by reference to a legal fiction, such as that any patient who previously worked in the health-care sector can be presumed already to have such knowledge. Cf. *Logan* v. *Greenwich Hospital Assn.*, 191 Conn. 282, 294–95, 465 A.2d 294 (1983). It makes even less sense to impute to a criminal defendant knowledge of the myriad challenges that might be brought against a proposed set of jury instructions, as would be required to execute a valid waiver, when even his attorney's awareness of such claims is admittedly fictitious.[19]

The practical fallacies in the original justification for the *Kitchens* rule are equally apparent. When there is nothing in the record to indicate either that defense counsel was aware of the constitutional claim at issue or that counsel intentionally opted to forgo every possible objection to the defective instruction, it is unrealistic to infer, as *Kitchens* requires, that counsel had knowledge of the claim and intentionally abandoned it. See *State* v. *Kitchens*, supra, 299 Conn. 538–39 (*Palmer, J.*, concurring). "[B]ecause waiver is the intentional relinquishment or abandonment of a known right . . . *Kitchens* requires us to presume, first, that counsel thought of every possible claim, from the most meritorious to the most frivolous, and everything in between, and, second, that, upon due consideration of each and every one of those claims, counsel decided to abandon them all, presumably for strategic reasons. Because it is obviously impossible for any defense attorney, or any team of defense attorneys, to conceive of all potential claims, whether meritorious or not, it is clear that *Kitchens* is predicated on a palpably unrealistic assumption." (Citation omitted; emphasis omitted.) *State* v. *Davis*, 311 Conn. 468, 497, 88 A.3d 445 (2014) (*Palmer, J.*, concurring); see also id. (explaining that, in reality, "competent defense attorneys invariably raise any and all [potentially meritorious] claims of which they are aware").

The defects in the original justification for *Kitchens*, then, are twofold. *Kitchens* relies on a fiction when the law calls for truth. And the fiction is a flimsy one at that.

Shortcomings of the New *Kitchens* Rationale

Apparently recognizing these flaws in *Kitchens*' foundation, both the state and the majority have now jettisoned the legal fiction rationale. In the present case, they take pains to disavow *Kitchens*' premise that defense counsel, merely having reviewed and acquiesced in a proposed jury charge, may be presumed to have considered and rejected every potential challenge thereto.

Instead, to replace the missing cornerstone, the state now offers—and the majority embraces—a new justification for *Kitchens*' implied waiver theory. It goes as follows: "[W]hen the trial court asks counsel to make an informed and binding judgment regarding whether to accept the jury instructions and counsel acquiesces, counsel waives *the procedural right* to object to the instructions on any of the multitude of possible grounds that counsel might presently be aware of or later perceive." (Emphasis added.) In other words, *Kitchens* now rests on the theory that defense counsel, by acquiescing in or assenting to the court's jury charge, knowingly and voluntarily relinquishes not a set of specific challenges or objections thereto but, rather, the procedural right of the defendant to later complain about any aspect of the charge. In the remainder of this part of this opinion, I explain why the state's new rationale fares no better than the old one, and why it does not warrant a departure from our pre-*Kitchens* jurisprudence.

The state contends that its new theory does not, in fact, break any new ground but simply applies the preexisting doctrine that the "waiver of the right to exercise a right precludes [the] later assertion of any and all claims bundled within that right." The state argues that this sort of procedural waiver is well established, both in the *Golding* context and with respect to the waiver of other constitutional rights. The argument fails on many levels.

I begin by observing that the state's new theory fails to draw the proper parallel between other constitutional rights and the one at issue in *Kitchens*. When a defendant waives freedoms such as the right to counsel or the right to trial by jury, he is waiving just that. What he surrenders, fundamentally, is the assistance of an attorney, or the presence of a jury to decide his fate. That he may later be barred from complaining on appeal that he was deprived of his sixth amendment rights is a *consequence* of that waiver, but the ability to appeal per se is not the right that is waived. In *Kitchens* cases, by the same token, what the defendant allegedly waives is not a general procedural right to object or appeal but, rather, the due process right to be tried by a jury that has been properly instructed on the essential ele-

ments of the charged crimes, the state's burden of proof, and other constitutionally significant points of law. See, e.g., *State* v. *Avila*, 223 Conn. 595, 603, 613 A.2d 731 (1992) (right to properly instructed jury is guaranteed by due process clauses of fourteenth amendment to United States constitution and article first, § 8, of Connecticut constitution); see also *State* v. *Golding*, 213 Conn. 233, 241, 567 A.2d 823 (1989) (jury that is properly instructed as to essential elements of charged crimes is necessary to ensure fair trial). What the state needs to demonstrate, then, is that, by acquiescing in the trial court's instructions, a defendant, through counsel, knowingly and voluntarily relinquishes the right to a properly instructed jury, with the understanding that one consequence of that waiver may be the inability to challenge on appeal any subsequently discovered defects in the instructions. As I discuss hereinafter, the circumstances under which any competent attorney would knowingly and voluntarily make such a waiver, or advise a client to do so, are extremely limited. Whereas defense counsel might waive a particular instructional challenge for strategic or other reasons, it is virtually inconceivable that she would freely choose to relinquish a defendant's general right to enforce his right to a properly instructed jury.

Before I discuss the specific flaws in the state's new macro waiver theory, I review the well established principles that govern the law of waiver. "The party alleged to have waived a right must have had both knowledge of the existing right and the intention of forgoing it." Black's Law Dictionary, supra, p. 1813 (defining "waiver"); see also *State* v. *Kitchens*, supra, 299 Conn. 469. With respect to the knowledge element, "[w]aiver arises from an affirmative act and is consensual. It involves the idea of assent, and assent is an act of understanding." (Footnote omitted.) 28 Am. Jur. 2d, supra, § 183, p. 648; see also *State* v. *Kitchens*, supra, 469. With respect to intent, because "a waiver is the intentional abandonment or relinquishment of a known right . . . an intent to waive must be shown by unequivocal acts or conduct that [is] inconsistent with any intention other than to waive . . . ." (Footnote omitted.) 28 Am. Jur. 2d, supra, § 35, pp. 501–502; see also *State* v. *Johnson*, 316 Conn. 45, 55–56, 111 A.3d 436 (2015); *Gardner* v. *New London*, 63 Conn. 267, 277, 28 A. 42 (1893); *Zenon* v. *R.E. Yeagher Management Corp.*, 57 Conn. App. 316, 327, 748 A.2d 900 (2000). Courts should find a waiver, then, only in the "voluntary abandonment or surrender by a capable person of a right known to him or her to exist with the intent of forever depriving him or her of the benefits of the right." 28 Am. Jur. 2d, supra, § 183, pp. 647–48. These same standards apply regardless of whether the alleged waiver is express or implied. See, e.g., *Wadia Enterprises, Inc.* v. *Hirschfeld*, 224 Conn. 240, 251–52, 618 A.2d 506 (1992).

To summarize the governing law, in order to find that a defendant has waived by implication a constitutional right, it must be established (1) unequivocally (2) that the defendant is generally aware of the costs and benefits of waiving the right, and (3) that, with the choice either to retain or relinquish the right, the defendant voluntarily opts to abandon it. Accordingly, if it could be established unequivocally that defense counsel did in fact knowingly and voluntarily waive her client's procedural right to object to a trial court's proposed jury charge, then I might agree that the client could be precluded on appeal from challenging particular aspects of the jury charge, even defects of which the defendant and defense counsel were unaware at the time of trial. The problem is, in the typical *Kitchens* scenario, none of these three preconditions for a valid implied waiver is in fact satisfied. *Kitchens* improperly presumes waiver in the absence of clear evidence thereof; it does so despite the fact that no reasonable defendant or defense counsel would knowingly execute such a waiver; and it deprives the defendant of the ability to choose *not* to waive his rights, rendering meaningless both the concept of a right and that of a waiver.

The first problem with the state's new theory is that it, no less than the original *Kitchens* rationale, violates the fundamental principle that the waiver of a criminal defendant's constitutional rights cannot be presumed or imputed, but must be demonstrated clearly and unequivocally. "[T]o establish a waiver of a legal right, there must be a clear, unequivocal, and decisive act of a party showing such a purpose." 28 Am. Jur. 2d, supra, § 183, p. 648; see also *Gardner* v. *New London*, supra, 63 Conn. 277. Although it is true that a waiver need not be express but, instead, can be implied by conduct, waiver nevertheless cannot be imputed or presumed. See, e.g., *State* v. *Gore*, 288 Conn. 770, 775, 783–84, 955 A.2d 1 (2008); see also C. Tams, "Waiver, Acquiescence, and Extinctive Prescription," in The Law of International Responsibility (J. Crawford et al. eds., 2010) pp. 1035–36.

A necessary corollary of this principle is that there is a strong presumption against a finding of waiver, especially a waiver of the constitutional rights of a criminal defendant. See, e.g., *North Carolina* v. *Butler*, 441 U.S. 369, 373, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979) ("courts must presume that a defendant did not waive his rights"); *Miranda* v. *Arizona*, 384 U.S. 436, 475, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) ("[t]his [c]ourt has always set high standards of proof for the waiver of constitutional rights"). As the United States Supreme Court explained in *Johnson* v. *Zerbst*, supra, 304 U.S. 458, "courts indulge every reasonable presumption against waiver of fundamental constitutional rights and . . . *do not presume acquiescence in the loss of funda-*

*mental rights*." (Emphasis added; footnote omitted; internal quotation marks omitted.) Id., 464; accord *State* v. *Woods*, 297 Conn. 569, 583–84, 4 A.3d 236 (2010).

It is crystal clear, then, that the concept of implied waiver is not a talisman that courts can raise whenever they would prefer not to consider an unpreserved claim on appeal. Rather, an implied waiver must be a true waiver, knowing and voluntary, and courts must be equally certain before concluding that a defendant has waived by implication his fundamental rights. The only difference between express and implied waiver is that, in the latter case, it is the defendant's conduct, rather than his statements, that leaves no doubt of his intent to waive his rights. So, with respect to the fifth amendment right against self-incrimination, for example, waiver may be inferred when a suspect or a defendant, having been properly instructed as to his right to remain silent, proceeds to make a statement to the police or to testify in his own defense. Under those circumstances, assuming that the suspect or the defendant understands what is meant by the right to remain silent, his subsequent choice to make a statement or to testify *necessarily* implies a voluntary intent to waive that right. See, e.g., *State* v. *Talton*, 197 Conn. 280, 295, 497 A.2d 35 (1985) ("[b]y speaking, the defendant has chosen unambiguously not to assert his right to remain silent"). Similarly, a state will be found to have waived by implication its sovereign and constitutional immunity only when no other conclusion reasonably can be drawn. As the United States Supreme Court explained in *Edelman* v. *Jordan*, 415 U.S. 651, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974), "[c]onstructive consent is not a doctrine commonly associated with the surrender of constitutional rights, and we see no place for it here. In deciding whether a [s]tate has waived its constitutional protection under the [e]leventh [a]mendment, we will find waiver only [when] stated by the most express language or by such overwhelming implications . . . as (will) leave no room for any other reasonable construction." (Internal quotation marks omitted.) Id., 673; see also *Envirotest Systems Corp.* v. *Commissioner of Motor Vehicles*, 293 Conn. 382, 389–90, 978 A.2d 49 (2009) ("[I]n order for a court to conclude that a statute waives [this state's] sovereign immunity by force of necessary implication, it is not sufficient that the claimed waiver reasonably may be implied from the statutory language. It must, by logical necessity, be the only possible interpretation of the language. . . . [W]e must interpret any uncertainty as to the existence of a waiver as preserving sovereign immunity." [Citation omitted; emphasis omitted.]). Neither the state nor the majority has identified any other fundamental right the true waiver of which would be implied merely by presumption, without unequivocal evidence of an actual intent to waive.[20] Nevertheless, the majority, while changing course as to exactly what right is being waived, retains the improper

presumption that defense counsel who reviews and acquiesces in the court's proposed instructions knowingly and intentionally waives her client's right to a properly instructed jury, even when the instructions later prove to be defective. Neither the state nor the majority offers any justification for its departure from the black letter legal principle that we will not presume the waiver of fundamental constitutional rights.

The second problem with the state's new macro waiver theory is that, unlike with constitutional protections such as the right to counsel and the right against self-incrimination, there is no reason either to conclude or to assume that the defendant in a typical *Kitchens* scenario has made a knowing and intelligent decision that the benefits of waiving the right outweigh the costs. Although it is true that a defendant need not have an omniscient understanding of every possible repercussion of such a decision in order to execute a valid waiver, a reviewing court must at least assure itself that the defendant is aware of the basic tradeoffs involved. For example, a defendant who opts to testify in his own defense must understand that, in order to obtain the benefits of setting before the jury his version of the facts and his believability as a witness, he must expose himself to the risks associated with cross-examination and impeachment. See, e.g., *Brown* v. *United States*, 356 U.S. 148, 154–55, 78 S. Ct. 622, 2 L. Ed. 2d 589 (1958). Similarly, in order to knowingly and intelligently waive the right to counsel, a defendant must understand that the benefits of self-representation—autonomy and control over trial strategy—are purchased at the cost of an attorney's legal experience, judgment, and familiarity with the rules of practice, all of which help to ensure that the defendant will receive a fair trial. See, e.g., *Faretta* v. *California*, 422 U.S. 806, 834–35, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975); *State* v. *Townsend*, 211 Conn. 215, 218–19, 558 A.2d 669 (1989). In a typical *Kitchens* case, by contrast, unless there is evidence either that the parties discussed the specific defect at issue, or that defense counsel's failure to object was intentional and strategic, there simply is no basis for concluding that the defendant made an informed and intelligent decision to waive his right to a properly instructed jury.

The state's new theory, namely, that a defendant knowingly chooses to waive not specific objections but, rather, the right to object, presents in turn a new difficulty: why would a defendant ever knowingly waive the right to challenge legally deficient jury instructions when he receives nothing whatsoever in return? For each of the other rights to which the state and the majority analogize the right to a properly instructed jury that was at issue in *Kitchens*, a defendant presumably understands that he will derive some important benefit in exchange for relinquishing the right and, possibly, the ability to appeal if unforeseen problems later arise.

For example, a defendant forgoes: the right to counsel for the ability to control his own representation; the right against self-incrimination for the opportunity to testify in his own defense and to tell the jury his side of the story; the right to a jury trial for the ability to have a dispassionate and legally knowledgeable judge determine his guilt; and the right to a trial for the reduced sentencing risk associated with a guilty plea.[21] With *Kitchens*, by contrast, one is hard pressed to identify any reason why an informed, intelligent defendant, or defense counsel, would ever choose to waive the right to argue that the jury was improperly charged as to the elements of the charged crimes, the state's burden of proof, or other constitutionally significant legal principles.[22] As Judge Sheldon of the Appellate Court has recently explained, "[r]egardless of counsel's particular trial strategy on behalf of his client, he simply has no excuse not to insist that the jury be properly instructed on each essential element of every charged offense . . . . [T]here is no conceivable tactical justification for defense counsel not to preserve his client's right not to be convicted without proof beyond a reasonable doubt of each essential element of each charged offense by insisting that proper jury instructions be given on those elements . . . ." *Holloway* v. *Commissioner of Correction*, 145 Conn. App. 353, 366–67, 77 A.3d 777 (2013). And if no competent counsel or defendant would waive such a right, then on what basis does the majority assume that all such decisions are knowing and intelligent?

The third—and perhaps most significant—flaw in the state's new theory of implied waiver is that it improperly assumes that defense counsel in a *Kitchens* case *voluntarily* chooses to relinquish the defendant's right to challenge the jury instructions on appeal. In order for a decision "to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." *United States* v. *Garcia*, 890 F.2d 355, 360 (11th Cir. 1989); see also Webster's Third New International Dictionary (2002) p. 2564 (defining "voluntary" as "proceeding from the will: produced in or by an act of choice"). Each of the other rights to which the state and the majority analogize the right at issue in *Kitchens* involves a true choice. The defendant can retain counsel or represent himself; he can testify or remain silent; he can opt for trial by jury or a bench trial; he can plead guilty or take his chances at trial. Under *Kitchens*, by contrast, defense counsel who is unaware of any defects in the court's proposed instructions but wishes to retain her client's right to insist on a properly instructed jury and to contest any defects that later come to light is precluded from doing so. The trial court need only afford counsel a reasonable opportunity to review the instructions and then ask her whether they look okay. At that point, counsel cannot articulate objections of which she is not yet aware; nor can she refuse to answer

the court's query.[23] *Her only option is to acquiesce.*

An obvious solution to this conundrum would be to allow counsel under those circumstances to inform the court that, following a careful review of the proposed charge, she is not presently aware of any defects but that her client wishes to retain his due process rights to a properly instructed jury should he later become aware of any defects in the charge. See *State* v. *Kitchens*, supra, 299 Conn. 541 (*Palmer*, *J.*, concurring). In other words, counsel could represent to the court that the defendant "has not raised a constitutional challenge to the charge *because he is unaware of any such claim, and not because he has elected to waive the* [*right*]." (Emphasis in original.) Id. In *Kitchens*, I explained that, "[i]n view of the fact that the doctrine of implied waiver is employed for the purpose of ascertaining an actor's intent when that intent remains *unstated*, counsel's express statement disavowing waiver—reflecting counsel's *actual intent*—necessarily would trump any finding of implied waiver . . . ." (Emphasis in original.) Id. Unfortunately, the majority in *Kitchens* decided to foreclose that option, inexplicably pronouncing that even such a statement by counsel would constitute an "intentional waive[r]."[24] Id., 487–88 n.25.

At the most fundamental level, a criminal defendant cannot be said to have a constitutional right to a properly instructed jury if he can be *forced* to waive that right against his will and if the law provides no mechanism through which he can retain it if he so chooses. If the majority wishes to decide, for reasons of public policy, that the right to a properly instructed jury will be *forfeited* if not timely exercised,[25] and that unpreserved constitutional challenges to the instructions will not be subject to *Golding* review on appeal, that at least I can understand. But *Kitchens*, as currently rationalized, renders incoherent, in one fell swoop, both the concept of a right and that of a waiver. It is a high price to pay to avoid having to decide a few more instructional claims.[26]

To summarize, there is a strong presumption against finding that a criminal defendant has waived his constitutional rights. Even implied waiver of those rights can be found only on the basis of unequivocal evidence that the defendant, with full knowledge and understanding of his rights, actually intends to waive them. These principles are black letter law, and each is deeply and firmly rooted in the law of Connecticut. The majority fails to explain either how these well established criteria are satisfied in the *Kitchens* context, or why they are not applicable. To jettison them, merely to achieve a desired policy outcome, is to place at risk not only our *Golding* jurisprudence, but all of the other branches of the law in which the concept of waiver plays a fundamental role: constitutional law, collective bargaining, tort, contract, insurance, even sovereign immunity. This, I continue to believe, is a serious mistake.

## C

### *Kitchens* Does Not Reflect Sound
### Judicial or Public Policy

In part I B of this opinion, I explained why I continue to believe that, from a descriptive standpoint, defense counsel who merely acquiesces in a trial court's proposed jury instructions does not thereby signify her client's unequivocal knowing and voluntary intent to relinquish any and all claims, both known and unknown, that the instructions are constitutionally deficient. Because mere acquiescence does not satisfy the well established requirements for a waiver of a defendant's constitutional rights, and because we consistently have held that unpreserved claims that satisfy the four prongs of *Golding* are reviewable on appeal unless waived, that should be the end of the story. However, because both the state and the majority also have offered various policy rationales why such claims should be treated *as if* they have been waived, I take this opportunity to reiterate why, from a normative standpoint, I do not believe that the *Kitchens* rule reflects sound judicial or public policy.

Rules of reviewability, such as *Golding*, require that we weigh the constitutional rights of a criminal defendant against the interests of the state in the prompt and efficient administration of justice. See, e.g., P. Westen, supra, 75 Mich. L. Rev. 1238. On the defendant's side of the ledger are all of the various rationales that underlie the long line of cases in which both this court and our sister courts have concluded that unpreserved claims of error should not be barred from appellate review when the record is adequate and the alleged error is of constitutional magnitude. See, e.g., *State* v. *Golding*, supra, 213 Conn. 239–40; *State* v. *Evans*, 165 Conn. 61, 70, 327 A.2d 576 (1973); see also *Wiborg* v. *United States*, 163 U.S. 632, 658, 16 S. Ct. 1127, 41 L. Ed. 289 (1896). Chief among those rationales is that, in the event that the state has obtained a criminal conviction solely by violating a defendant's constitutional rights, "it would be a rank miscarriage of justice to allow [the conviction] to stand." *United States* v. *La Guardia*, 902 F.2d 1010, 1013 (1st Cir. 1990). "In the fast and fluid nature of a trial, even the most competent counsel can overlook an issue that, in hindsight, appears to be a glaring error, devastating to an accused's interests." T. Erisman, "Defining the Obvious: Addressing the Use and Scope of Plain Error," 61 A.F. L. Rev. 41, 47 (2008). *Golding* reflects the fact that our "[r]ules of practice and procedure are devised to promote the ends of justice, not to defeat them." *Hormel* v. *Helvering*, 312 U.S. 552, 557, 61 S. Ct. 719, 85 L. Ed. 1037 (1941).

By reviewing allegations that criminal convictions have been obtained on the basis of serious constitutional violations, appellate tribunals not only ensure

that potentially innocent defendants are not made to suffer imprisonment as a result of counsel's inadvertent mistakes, but also help to maintain public confidence in the administration of justice. See, e.g., *People* v. *Ramos*, 33 App. Div. 2d 344, 348, 308 N.Y.S.2d 195 (1970); cf. *Clyatt* v. *United States*, 197 U.S. 207, 222, 25 S. Ct. 429, 49 L. Ed. 726 (1905); *State* v. *Miller*, 202 Conn. 463, 469, 522 A.2d 249 (1987). Moreover, permitting appellate review under such circumstances "has a salutary effect on the prosecution's conduct of the trial. If the intelligent prosecutor wishes to guard against the possibility of reversible error, he cannot rely on the incompetence or inexperience of his adversary but, on the contrary, must . . . intervene to protect the defendant from the mistakes of counsel." (Internal quotation marks omitted.) *United States* v. *Frady*, 456 U.S. 152, 180, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982) (Brennan, J., dissenting). Reviewability thus helps to ensure that the state and the trial court, no less than defense counsel, guard vigilantly against any violations of a defendant's fundamental constitutional rights.

The availability of *Golding* review is especially important in the jury instruction context because of the substantial risk that erroneous instructions, once entrenched, will taint the results of, and go unchallenged in, numerous criminal prosecutions. Several of our recent *Kitchens* cases, including the companion case to the present case; see *State* v. *Herring*, 323 Conn. 526, A.3d (2016); involve claims that certain of the standard criminal jury instructions available on the Connecticut Judicial Branch website[27] are unconstitutional, either facially or as applied in a particular case. When standard instructions governing a particular point of law are available, both defense counsel and the trial court understandably may be hesitant to second-guess these instructions, which have been drafted and approved by the Criminal Jury Instruction Committee. See *State* v. *Helmedach*, 125 Conn. App. 125, 136, 8 A.3d 514 (2010) (presuming that standard jury instructions are correct in law), aff'd, 306 Conn. 61, 48 A.3d 664 (2012). In *State* v. *Herring*, supra, 526, for example, the trial court informed counsel: "I took this straight from the jury instructions that are on the [Judicial Branch] website that are the standard that we should use. . . . Unless you have a case that tells me that I should [deviate from those], I'm leery to stray from the standard instructions that have been tested and used over time." The court later remarked: "I'm not going to change all of these charges and go against the standard instructions. I'm loathe to do that because that's where courts get into trouble, when they start making changes." The deference that both defense counsel and the trial courts accord to the standard instructions creates a powerful structural impediment to the raising of constitutional challenges to those instructions at trial, as even the most diligent and competent counsel tend to focus their

"political capital" on those objections that they deem reasonably likely to succeed. The availability of *Golding* review is, therefore, essential if defects in these widely used instructions are to be identified and corrected on appeal.

*State* v. *Johnson*, supra, 316 Conn. 45, is an important case in point. In *Johnson*, the Appellate Court determined that, under *Kitchens*, the defendant, Jennifer Johnson, had waived her unpreserved instructional challenge. See *State* v. *Johnson*, 137 Conn. App. 733, 760, 49 A.3d 1046 (2012), aff'd, 316 Conn. 45, 111 A.3d 436 (2015). On appeal to this court from the Appellate Court's judgment, we disagreed, concluding that, due to the unique procedural posture of the case, Johnson's claim had not been waived. *State* v. *Johnson*, supra, 56–57. Reviewing her challenge to the standard jury instructions on nonexclusive constructive possession of contraband, we held that the standard instruction, which the trial court used at Johnson's trial, was constitutionally deficient. Id., 61. Although we ultimately found the error to be harmless; id., 64; the case afforded us an important opportunity to clarify this area of the law, an opportunity that would have been lost, or at least postponed indefinitely pending the filing and final resolution of a habeas petition, if the state had prevailed on its claim under *Kitchens*. See id., 61–63. Similarly, *State* v. *Pond*, 315 Conn. 451, 108 A.3d 1083 (2015), in which the state argued unsuccessfully that the instructional claims of the defendant, Terrell Williams Pond, were waived under *Kitchens*, allowed us to review, clarify, and develop the law governing the mens rea element of criminal conspiracy, resolving a split of opinion in the Appellate Court.[28] See id., 466–88; see also *State* v. *Carrion*, 313 Conn. 823, 844–45, 847–49, 100 A.3d 361 (2014) (assuming without deciding that claim was not waived under *Kitchens*, and exercising supervisory authority to direct trial courts to refrain from instructing juries that state does not want conviction of innocent persons).

In total, of the nearly twenty appeals decided in Connecticut in the five years following our decision in *Kitchens* in which the state argued unsuccessfully that an unpreserved claim of instructional error had been waived, or conceded that such a claim had not been waived, the reviewing court found instructional error— either harmless or reversible—in approximately 40 percent of the cases.[29] Similarly, prior to *Kitchens*, *Golding* review of unpreserved claims afforded us or the Appellate Court an important opportunity to clarify and develop the criminal law in instructional error cases such as *State* v. *Arroyo*, 284 Conn. 597, 610, 935 A.2d 975 (2007) (clarifying standard governing trial court's decision to charge jury on third-party culpability evidence), *State* v. *Whelan*, 200 Conn. 743, 756–58, 513 A.2d 86 (reconciling inconsistent precedent and holding that " 'more probable than not' " instruction on circum-

stantial evidence impermissibly diluted state's burden of proving guilt beyond reasonable doubt), cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), *State* v. *Nugent*, 199 Conn. 537, 545, 508 A.2d 728 (1986) (clarifying common-law right of bail bondsman to apprehend principal), *State* v. *Burke*, 182 Conn. 330, 333, 438 A.2d 93 (1980) (holding that trial court must give no unfavorable inference instruction unless defendant requests otherwise), and *State* v. *Sitaras*, 106 Conn. App. 493, 507, 942 A.2d 1071 (instructing trial courts to refrain from using certain language in standard criminal jury charge), cert. denied, 287 Conn. 906, 950 A.2d 1283 (2008). If the *Kitchens* rule is retained, such opportunities will become increasingly scarce as trial courts adopt the practice of forcing defense counsel to execute a *Kitchens* waiver. Indeed, in most of the recent cases in which the state failed to prevail on its waiver argument under *Kitchens*, the defendant's claim was deemed not to have been waived only because the record did not indicate that the trial court had given defense counsel adequate opportunity to review and comment on the draft charge or a supplemental charge. If the trial court had dotted all of its I's and crossed all of its T's, the errors likely would have gone uncorrected on appeal.[30]

On the other side of the ledger, the state and the majority contend that *Kitchens* claims should be treated as unreviewable primarily for reasons of expediency and fairness. Neither rationale is persuasive.

With respect to expediency, finality, and judicial economy, the argument for retaining *Kitchens* appears to be animated by the antithetical fears that, if we were to return to the state of the law before *Kitchens*, either (1) this court and especially the Appellate Court would be inundated by and forced to dedicate scare judicial resources to resolving nonmeritorious jury instruction claims concocted after the fact by overzealous appellate counsel, or (2) an abundance of *meritorious* claims would result in the reversal of otherwise valid convictions and the need for costly retrials. In fact, the available data suggest that both of these speculative fears are largely unfounded.

With respect to the former concern, there is little evidence that, prior to *Kitchens*, our appellate system was bogged down trying to resolve a disproportionately high number of trivial or nonmeritorious claims challenging the constitutionality of criminal jury instructions. A thorough review of all of the claims of unpreserved error raised by criminal defendants in this court and the Appellate Court during the sixteen years leading up to our consideration of *Golding*, for example, revealed that 10.1 percent of jury instruction claims resulted in a finding of harmful error, whereas only 8.6 percent of noninstructional claims merited reversal. See *State* v. *Golding*, Conn. Supreme Court Records &

Briefs, May Term, 1989, Appendix to the Defendant's Supplemental Brief pp. A1–A103 (surveying cases). By contrast, almost none of the claims that certain statements or testimony had been improperly admitted resulted in reversible error; see id.; and, yet, there is no suggestion that meritless claims of that sort are clogging our appellate system and should be unreviewable on appeal.

Moreover, it is now clear that any lightening of our appellate docket as a result of *Kitchens* has been more than offset by what has become a veritable cottage industry in *Kitchens* litigation. That is to say, rather than dedicating our resources to resolving a defendant's legal claim on the merits, this court and the Appellate Court now expend significantly more effort resolving allegations by the state that a particular jury instructional claim has been waived and, therefore, is not entitled to appellate review. Because *Kitchens* calls for "a close examination of the record and the particular facts and circumstances of each case"; *State* v. *Kitchens*, supra, 299 Conn. 483; our post-*Kitchens* cases fill many pages of the reports parsing the trial court records for a hint of waiver.[31] By contrast, once an appellant survives *Kitchens* scrutiny, nonmeritorious claims of instructional error typically can be resolved on the merits in just a few pages or less.[32] In some cases, the juxtaposition is especially pronounced. For example, in *State* v. *Kirby*, 137 Conn. App. 29, 46 A.3d 1056, cert. denied, 307 Conn. 908, 53 A.3d 222 (2012), the Appellate Court spent six pages determining whether the defendant's claim was waived under *Kitchens* but needed only one paragraph to dispense with his claim on the merits. See id., 45–51; see also *State* v. *Ruocco*, 151 Conn. App. 732, 739–43, 95 A.3d 573 (2014) (taking approximately five pages to dispose of waiver issue and devoting less than one page to merits of instructional claim), aff'd, 322 Conn. 796, 144 A.3d 354 (2016).

Of course, judicial efforts do not always correlate perfectly to page counts in the official court reports. In some cases, however, it is beyond cavil that the resources we are dedicating to resolving *Kitchens* quibbles could be better spent interpreting the law. Consider *State* v. *Davis*, 131 Conn. App. 50, 26 A.3d 128 (2011), rev'd, 311 Conn. 468, 88 A.3d 445 (2014), in which the Appellate Court penned a ten and one-half page analysis of the *Kitchens* issue, ultimately concluding that the defendant's unpreserved claim of instructional error was impliedly waived. Id., 55–65. We granted certification to appeal; *State* v. *Davis*, 302 Conn. 943, 29 A.3d 468 (2011); and, nearly three years later, issued majority and concurring opinions totaling nearly forty pages, in which we concluded that *Kitchens* did not in fact bar review of the defendant's claim. *State* v. *Davis*, supra, 311 Conn. 483; see id., 495 (*Palmer*, *J.*, concurring); id., 505 (*McDonald*, *J.*, concurring). On remand, it required only ten and one-half pages of analysis for the Appellate

Court to decide *all* of the defendant's claims on the merits. See *State* v. *Davis*, 154 Conn. App. 216, 223–33, 107 A.3d 962 (2014), cert. denied, 315 Conn. 918, 107 A.3d 961 (2015). Significant time and expense could have been saved if the Appellate Court had simply reached and resolved the unpreserved claims at the outset.

This is especially true in light of the fact that the failure to review a claim on direct appeal often will result in the need for a more resource intensive habeas trial on the same issue. As we explained in *State* v. *Elson*, 311 Conn. 726, 91 A.3d 862 (2014), "[t]his, of course, serves no judicial economy, as the rapidly written appellate opinion of today is nothing more than kicking the can down the road to be addressed in the habeas petition of tomorrow—a counterproductive action that actually increases the net workload of the judicial system." (Internal quotation marks omitted.) Id., 752.

Nor is there much support for the concern that overruling *Kitchens* would disturb settled decisions and force the state to retry criminal convictions long after the fact. In reality, and as the majority is forced to concede, "the number of cases in which a defendant obtain[ed] reversal of his conviction on the basis of *Golding* review . . . [prior to *Kitchens* was] negligible." *State* v. *Kitchens*, supra, 299 Conn. 523 (*Katz, J.*, concurring); see also *State* v. *Mungroo*, 299 Conn. 667, 679 n.4, 11 A.3d 132 (2011) (*Katz, J.*, dissenting) (in decade preceding *Kitchens*, Supreme Court and Appellate Court together found reversible error on *Golding* review of jury instruction challenges approximately twice per year on average).[33] A far more frequent outcome before *Kitchens* was that appellate review revealed harmless errors in the trial court's jury instructions. See *State* v. *Golding*, supra, 213 Conn. 241.[34] Such decisions play an important role in our jurisprudence: they provide a forum for clarifying and developing the law but place no additional burdens on the state or the judicial system. Indeed, as I discuss more fully hereinafter, they may eliminate the need for a costly habeas petition and subsequent appeals that would result from finding a claim unreviewable under *Kitchens*. Accordingly, I am not swayed by the parade of horribles that the state invokes in its brief.

The state's second set of policy arguments relates to questions of fairness. I understand the state's position to be that defense counsel who fails to raise a potentially meritorious challenge during the charging conference does so either for tactical reasons or inadvertently. If the decision is tactical, the state contends, we should not give the defendant a second bite at the apple and permit counsel to try out a different tactic on appeal when the tactic utilized at trial was unsuccessful. By contrast, if the failure to object is inadvertent, then we

should adopt rules of reviewability that will incentivize greater diligence or, in the absence of such rules, leave to the habeas courts any claims that counsel's performance was ineffective. In either case, the state believes that allowing a defendant to press on appeal objections that his counsel failed to raise at trial would be unfair both to the state and to the trial court.

Although the state's concerns are well taken, I ultimately find its arguments to be unpersuasive. Turning first to the question of tactical or strategic waiver, I agree with the defendant that it is almost inconceivable that defense counsel would intentionally hold back a potentially meritorious objection and knowingly permit her client's constitutional rights to be trampled, solely so that, if her client is ultimately convicted, appellate counsel might advance a winning argument on appeal. As Judge Henry J. Friendly once explained, "it is exceedingly hard to visualize a case [in which] a defendant or his lawyer would deliberately lay aside a meritorious claim so as to raise it after the defendant was jailed." H. Friendly, "Is Innocence Irrelevant? Collateral Attack on Criminal Judgments," 38 U. Chi. L. Rev. 142, 158 (1970).

When the state and the majority presume that a decision to forgo potential objections to the trial court's proposed jury charge is strategic, however, I do not believe that this is the sort of strategy they have in mind.[35] Rather, the concern seems to be that a defendant, having pursued one strategy or theory of the case at trial and having failed to prevail, might change direction on appeal and argue that he should have received the benefit of instructions reflecting a different, perhaps contradictory, strategy.

As I already discussed; see part I A of this opinion; when the record clearly suggests that defense counsel's failure to raise an instructional challenge at trial was the result of a tactical decision, I agree with the majority that the unpreserved claim should be deemed waived and unreviewable on appeal. This often will be the case, for instance, when counsel does not seek an instruction as to lesser included offenses in the hope that the jury will find the defendant not guilty of the more serious charge; see, e.g., *United States* v. *Estrada-Fernandez*, 150 F.3d 491, 496 (5th Cir. 1998); cf. L. Cunningham, "Appellate Review of Unpreserved Questions in Criminal Cases: An Attempt to Define the 'Interest of Justice,'" 11 J. App. Prac. & Process 285, 321 (2010); or when counsel advances a theory of mistaken identity and refrains from seeking instructions, such as on self-defense or sexual consent, that would tend to suggest to the jury that the defendant was in fact the perpetrator. See, e.g., *State* v. *Fuller*, 158 Conn. App. 378, 384–85, 119 A.3d 589 (2015); see also *United States* v. *Crowley*, 318 F.3d 401, 411 (2d Cir.) (concluding that defense counsel's failure to seek instruction on renunciation

represented reasonable strategic choice not to suggest to jury that defendant began with but later abandoned criminal purpose), cert. denied, 540 U.S. 894, 124 S. Ct. 239, 157 L. Ed. 2d 171 (2003). Under those or similar circumstances, I have no difficulty concluding that counsel's failure to object was strategic and resulted in an implied waiver of any unpreserved challenges.

What I cannot agree to is *Kitchens' presumption* that counsel's decision not to raise an objection at trial must be knowing and strategic, even when the record contains no indication thereof. See *State* v. *Kitchens*, supra, 299 Conn. 470, 481–83. As Justice Katz explained in her concurring opinion in *Kitchens*, a presumption of strategic waiver "undermines this court's exhortation that *Golding* review is intended to break down any categorical or absolute bars to appellate review by foreclosing review of an entire class of trial errors. Moreover, by concluding that [a] mere failure to object to an improper instruction constitutes a waiver of the defendant's appellate rights, the [defendant is] essentially single[d] . . . out to bear the consequences of the error despite the equal obligations [of] the trial court and the [state] to identify and to correct the error." (Emphasis omitted.) Id., 518–19 (*Katz, J.*, concurring); see also *Moreno* v. *State*, 341 P.3d 1134, 1146 (Alaska 2015) ("[w]hether the defendant made a tactical decision not to object or intelligently waived an opportunity to object must be plainly obvious from the face of the record, not presumed in the face of a silent or ambiguous record").[36]

Lastly, the state contends that, even if counsel's failure to object is not strategic but, rather, merely inadvertent, we should treat any unpreserved objections as waived because such a rule will provide defense counsel, the state, and the trial court with an incentive to identify any instructional errors at trial, when they can be readily corrected. I must confess that I am at a loss to understand the majority's apparent belief that treating unpreserved challenges as waived, and insulating them from appellate review, will somehow incentivize the state and trial courts to exercise greater diligence in unearthing such errors. It is the state and the trial court, after all, that stand to lose should a conviction be overturned as a result of the court's instructional error. One would think that, if any extra motivation is required for them to look after the defendant's constitutional rights, it would be the possibility of reversal that would inspire them, rather than the impossibility. In any event, I will focus my analysis on the state's argument that the *Kitchens* rule is needed to motivate defense counsel to adequately scrutinize the court's instructions at trial. There are at least three problems with the state's argument.

First, the majority has provided no support, either empirical or anecdotal, for its assumption that denying

review under *Kitchens* will reduce the number of cases in which defense counsel fails to identify and object to instructional errors due to mistake or inadvertence. As both courts and commentators have recognized, such a rule offers little deterrent value with respect to such oversights, "only marginally advances systemic fairness and does so by exacting a heavy price in individual fairness." *State* v. *Hargrove*, 48 Kan. App. 2d 522, 554, 293 P.3d 787 (2013); see also L. Cunningham, supra, 11 J. App. Prac. & Process 317 (trial attorneys should not be "held to the impossible standard of predicting, in the heat of battle, every conceivable legal issue that could provide for appellate relief after conviction"). In fact, the available evidence suggests that *Kitchens* has done little to increase the identification and rectification of instructional errors at trial, as this court and the Appellate Court have entertained dozens of claims of unpreserved instructional error in the five and one-half years since that case was decided, with no indication that the incidence of such claims is on the wane.

Second, even if *Kitchens* did create an incentive for defense counsel to exhaustively scrutinize each of the trial court's draft instructions for any possible error, it is far from clear that more efficient administration of justice would result. As the United States Supreme Court has cautioned, "such a rule would result in counsel's inevitably making a long and virtually useless laundry list of objections to [instructions] that were plainly supported by existing precedent." *Johnson* v. *United States*, 520 U.S. 461, 468, 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997). Better instead to trust that competent counsel will identify and raise any defects apparent to her at the time of trial, as is her professional obligation; see *State* v. *Mungroo*, supra, 299 Conn. 679–80 (*Katz, J.*, dissenting); W. Pizzi & M. Hoffman, "Jury Selection Errors on Appeal," 38 Am. Crim. L. Rev. 1391, 1404–1405 (2001); and then to rely on the safety net of independent appellate review to identify those hidden defects or potentially erroneous standard instructions most worthy of our consideration.

Third, neither the state nor the majority has provided any compelling rationale for carving out this single exception to our general rule of *Golding* review. We continue to review unpreserved claims of constitutional error that arises during other phases of the trial—everything from voir dire to the taking of evidence to jury deliberations—even though a *Kitchens*-type rule arguably would incentivize defense counsel to more diligently root out error in those stages of the process as well. Why then a special rule for jury instructions?

The only answer that the state offers is that the drafting of jury instructions is unique in that, at least in theory, it is a more collaborative process, during which the rules of practice encourage the state, defense counsel, and the trial court to pause and jointly reflect on

the proper way to instruct the jury on the law. See Practice Book §§ 42-16 through 42-19. This argument proves too much.

The exact same arguments that the state makes with respect to jury instructions could be made with respect to other phases of trial, such as the selection and exclusion of jurors during voir dire. See W. Pizzi & M. Hoffman, supra, 38 Am. Crim. L. Rev. 1435–36. Voir dire also is a collaborative process during which the state, defense counsel, and the trial court work together to select a fair, impartial, and qualified panel, as dictated by the rules of practice. See Practice Book § 42-3 (parties may stipulate as to reduced panel size); Practice Book § 42-4 (giving parties five days to challenge array); Practice Book §§ 42-5, 42-11 through 42-13 (parties and trial court are jointly responsible for selection of qualified panel). Jury selection, as with jury instruction, is a more deliberative process, unlike the trial itself, when defense counsel must make snap judgments as to whether to object to particular testimony or evidence. And yet, we have imposed no *Kitchens*-type rule to bar review of unpreserved claims concerning voir dire; nor do we presume that defendants have waived all such challenges. See, e.g., *State* v. *Mejia*, 233 Conn. 215, 231–32, 658 A.2d 571 (1995); *State* v. *Baldwin*, 224 Conn. 347, 369–70, 618 A.2d 513 (1993); but cf. *State* v. *Hodge*, 248 Conn. 207, 227, 726 A.2d 531 (unpreserved challenge under *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 [1986], was unreviewable under *Golding* because factual record was inadequate for appellate review), cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999).[37] We also continue to entertain unpreserved claims concerning plea agreements; *State* v. *Das*, 291 Conn. 356, 367–68, 968 A.2d 367 (2009); and sentencing; see *State* v. *Elson*, supra, 311 Conn. 740–41; even though those too are more collaborative and less frenetic phases of the criminal justice process during which defense counsel might reasonably be expected to have identified and challenged any potential violations of the defendant's constitutional rights. See Practice Book §§ 39-1, 39-3 through 39-5, 39-13 through 39-16 (plea agreements); Practice Book §§ 43-5, 43-7, 43-13 through 43-16 (sentencing). Accordingly, I see no reason that challenges to jury instructions should be distinguished from all other claims of constitutional error as underserving of *Golding* review.[38]

Lastly, I turn to the argument, advanced by the state and embraced by this court in *Kitchens*, that the *Kitchens* rule does not unfairly penalize criminal defendants for their attorneys' inadvertent failure to object to defective jury instructions because many defendants can obtain relief by filing a habeas action alleging ineffective assistance of counsel. See *State* v. *Kitchens*, supra, 299 Conn. 482, 496–98. I remain unpersuaded. The reasons why a habeas action is not an adequate substitute for appellate review in this context have been fully

expounded elsewhere. See, e.g., id., 523–24 (*Katz, J.,* concurring); id., 547–48 (*Palmer, J.,* concurring); see also L. Cunningham, supra, 11 J. App. Prac. & Process 318. Suffice it to say that many meritorious claims of serious instructional error will not be subject to correction in habeas actions, and even those petitioners who do ultimately prevail in such actions ordinarily must wait years, while they are wrongfully imprisoned, before they can obtain the benefit of such a ruling. Two points, however, do warrant further discussion.

First, with five and one-half years now having passed since we decided *Kitchens*, time and experience have borne out my concerns, and those of Justice Katz, that the majority's reliance on habeas proceedings as a panacea was seriously misplaced. When *Kitchens* was decided, we predicted that the rule would increase rather than decrease the burden on judicial resources because any time saved in avoiding appellate review of instructional error would be more than offset by the need for a full habeas trial on the issue. In fact, of the six cases decided in the year following our *Kitchens* decision in which the Appellate Court found claims of instructional error waived under *Kitchens*,[39] four already have resulted in habeas petitions related to the alleged instructional error.[40]

When *Kitchens* was decided, we also warned that habeas actions would only push back the inevitable, as petitioners whose ineffective assistance of counsel claims were denied on collateral review ultimately would return to the Appellate Court for review of those decisions. Sure enough, the first generation of post-*Kitchens* habeas appeals is now coming home to roost. See, e.g., *Bharrat* v. *Commissioner of Correction*, 167 Conn. App. 158, 143 A.3d 1106 (2016).

In addition, when *Kitchens* was decided, we warned that the vindication of meritorious claims would be unreasonably and unfairly delayed. This prediction was realized in *State* v. *Lahai*, 128 Conn. App. 448, 18 A.3d 630, cert. denied, 301 Conn. 934, 23 A.3d 727 (2011). In that case, the Appellate Court declined to review the unpreserved instructional claim of Juma A. Lahai pursuant to *Kitchens*; id., 459–60; even though the state itself conceded that the court's instruction had improperly placed on Lahai the burden of proving self-defense. See id., 451–52. We thereafter denied Lahai's petition for certification to appeal. *State* v. *Lahai*, 301 Conn. 934, 23 A.3d 727 (2011). In May, 2012, the habeas court granted Lahai's habeas petition and vacated his conviction. *Lahai* v. *Warden*, Superior Court, judicial district of Tolland, Docket No. TSR-CV-09-4003028-S (May 7, 2012). Lahai thus remained incarcerated a full year longer than was necessary to review and vindicate his claim.[41] In the usual case, an incarcerated defendant will have to wait far longer for his constitutional rights to be vindicated because, ordinarily, the state will

appeal from any adverse habeas judgment.

Second, I am troubled by the state's argument that a defendant who is barred by *Kitchens* from raising a claim on appeal, and whose claim is not a candidate for habeas relief, has not thereby been treated unfairly because the same incorrect law also may have been applied to other defendants' cases. I would remind the state that the defendant's claim is not that he was treated less favorably than others by the criminal justice system, in violation of his right to equal protection of the law. His claim, rather, is that he was deprived of his fundamental right to due process of law and, possibly, wrongly imprisoned as a result. The fact that other defendants also may have been denied a fair trial will be of little consolation, no more than one who is deprived of the right to practice his religion, or whose land is taken without just compensation, will be content to know that his neighbor was treated with equal injustice.

For all of the foregoing reasons, in the absence of clear evidence that a criminal defendant or defense counsel actually intended to waive a claim that a jury instruction violated the defendant's constitutional rights, I fail to see any reason why this court should insist on treating all such claims as if they had been waived.[42]

D

The *Kitchens* Rule Can Easily Be Circumvented

As previously discussed, in *Kitchens*, I explained how the *presumption* that a criminal defendant intends to waive his right to challenge the jury instructions can be overcome if defense counsel "simply . . . inform[s] the trial court that he has not raised a constitutional challenge to the charge *because he is unaware of any such claim, and not because he has elected to waive the claim.*" (Emphasis in original.) *State* v. *Kitchens*, supra, 299 Conn. 541 (*Palmer, J.*, concurring). I continue to believe that such a statement by defense counsel necessarily would defeat any inference that the defendant has in fact voluntarily waived his right to a properly instructed jury, and I would encourage the defense bar to test this theory.

In *Kitchens*, the majority offered four arguments as to why, in its view, even an express statement that the defendant does not wish to waive any unpreserved instructional claims would be insufficient to overcome the presumption of implied waiver. See id., 485–88 n.25. The majority in the present case reaffirms those arguments. For the reasons that follow, I continue to find the arguments of the majority at best unpersuasive and at worst deeply troubling.

The majority first argues that, if defense counsel is sincere in the statement that she is unaware of any constitutional defects in the court's charge, but such a

defect does in fact exist, then counsel is necessarily ineffective and the habeas court provides the appropriate forum to address the problem. See id., 487 n.25. I already have explained why a habeas court is not an adequate forum for resolving unpreserved jury instructional claims. More important, the argument that defense counsel who fails to identify any potential defect in a jury charge is ineffective is (1) wholly irrelevant to the issue of whether the defendant should be deemed to have knowingly waived a claim of which he and his counsel are unaware, and (2) contrary to well established law. See *Ledbetter* v. *Commissioner of Correction*, 275 Conn. 451, 461–62, 880 A.2d 160 (2005) ("[C]ounsel's failure to advance novel legal theories or arguments does not constitute ineffective performance. . . . Nor is counsel required to change then-existing law to provide effective representation." [Citations omitted; internal quotation marks omitted.]), cert. denied sub nom. *Ledbetter* v. *Lantz*, 546 U.S. 1187, 126 S. Ct. 1368, 164 L. Ed. 2d 77 (2006).

The majority in *Kitchens* also asserted that I "cite[d] no legal support [in my concurrence in that case] for a blanket preservation by trial counsel of all constitutional challenges to jury instructions merely on the basis of counsel's in-court statement that he or she is 'unaware' of a constitutional violation." *State* v. *Kitchens*, supra, 299 Conn. 488 n.25. If there is no authority that specifically discusses the type of attestation I have described, it is only because no other jurisdiction has followed the lead of this court in *Kitchens* and adopted a novel rule of implied waiver that so clearly departs from established precedent and black letter law. In any event, it is a matter of common sense, as well as a firmly entrenched principle throughout the law, that an express reservation of rights precludes a contrary finding that a party has waived his or her rights by implication. See, e.g., *RBC Nice Bearings, Inc.* v. *SKF USA, Inc.*, 318 Conn. 737, 767, 123 A.3d 417 (2015); *Connor* v. *Statewide Grievance Committee*, 260 Conn. 435, 445, 797 A.2d 1081 (2002); *State* v. *Kelley*, 206 Conn. 323, 333–35, 537 A.2d 483 (1988); *Olean* v. *Treglia*, 190 Conn. 756, 772, 463 A.2d 242 (1983); *Jones* v. *Civil Service Commission*, 175 Conn. 504, 511–12, 400 A.2d 721 (1978); *American Woolen Co*. v. *Maaget*, 86 Conn. 234, 241, 85 A. 583 (1912).

The majority in *Kitchens* also worried that "such a ploy could open up a 'Pandora's box,' flooding Connecticut courts with cases alleging improper jury instructions on every conceivable issue and making a mockery of the trial court's attempt to query and solicit counsel's input on the jury instructions." *State* v. *Kitchens*, supra, 299 Conn. 488 n.25. There is no need to panic. What I am advocating is simply that we return to our pre-*Kitchens* jurisprudence, pursuant to which the parties are encouraged to collaborate with the trial court in the drafting of legally accurate jury instructions and a

criminal defendant is deemed to have waived a claim when the record suggests that defense counsel was aware of the claim and failed to raise it for reasons of strategy or judgment, but claims of constitutional magnitude are otherwise reviewable under *Golding*. There was no deluge of unpreserved jury instructional claims back then, and there is no reason to fear that there will be one now if counsel merely circumvents the new *Kitchens* rule by honestly attesting that the fictional assumptions on which *Kitchens* relies are untrue in her client's case.

Lastly, the majority in *Kitchens* indicated that such a statement by defense counsel "would conflict directly with the mandate in rule 1.1 of the Rules of Professional Conduct that requires adequate preparation by counsel in representing a client, which presumably would include sufficient familiarity with the jury instructions to identify instructions that are constitutionally flawed." Id. The majority in the present case doubles down on this alarming statement, cautioning that "such conduct [also] would be inconsistent with our rules of practice, which seek to encourage good faith participation by counsel in the formulation of jury instructions." I find the majority's thinly veiled threats against defense counsel very concerning. It is preposterous to suggest that a commissioner of the Superior Court who, having engaged fully in a charging conference, merely and honestly informs the trial court that (1) she has thoroughly reviewed and considered its draft jury charge, (2) she is not aware of any constitutional defects other than those that she has articulated, but (3) her client does not wish to waive any challenges that might later become apparent (if, for instance, a federal court were subsequently to deem one of the instructions unconstitutional), thereby violates the rules of practice and exposes herself to charges of professional misconduct. The majority may, of course, disagree with me as to the legal implications of such an attestation with respect to overcoming the presumption of implied waiver. Under no circumstances, however, is it appropriate for this court to bullyrag a legal professional who, in the course of zealously defending her client, happens to expose the fact that the *Kitchens* emperor has no clothes.

### E

#### Stare Decisis

Lastly, I am not persuaded by the state's argument that stare decisis, or respect for judicial precedent, requires adherence to *Kitchens*. It is well established that "a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it." (Internal quotation marks omitted.) *State* v. *Salamon*, 287 Conn. 509, 519, 949 A.2d 1092 (2008). Setting aside the fact that *Kitchens* itself represented a departure from established precedent; see, e.g., *State*

v. *Ebron*, supra, 292 Conn. 679–82; and is, therefore, less entitled to stare decisis deference; see, e.g., *Adarand Constructors, Inc.* v. *Pena*, 515 U.S. 200, 234–35, 115 S. Ct. 2097, 132 L. Ed. 2d 158 (1995); there are at least three reasons why we are not bound to uphold the *Kitchens* rule.

First, the principal concerns that underlie the respect for judicial precedent—the need for stability and predictability in the law, and the importance of maintaining the institutional legitimacy of the judiciary—are at their nadir in cases such as this one, in which the highest court of a jurisdiction adopts prudential rules to manage its own docket and to determine which types of claims it will review. Although the parties read the history of our *Golding* jurisprudence differently, there is no dispute that the rules we have adopted to govern the review of unpreserved claims have evolved over the past several decades as we have sought to balance the various considerations discussed in part I C of this opinion. See generally *State* v. *Kitchens*, supra, 299 Conn. 447; *State* v. *Ebron*, supra, 292 Conn. 656; *State* v. *Golding*, supra, 213 Conn. 233; *State* v. *Evans*, supra, 165 Conn. 61. These considerations include (1) securing the fundamental constitutional rights of criminal defendants, (2) maintaining an orderly trial process in which potential errors are identified and remedied in a timely manner, (3) disposing of meritless appellate claims as efficiently as possible, (4) treating with fairness both the trial court and the state, and (5) providing an opportunity for appellate courts to clarify and develop the law outside the "the hurried and . . . hectic process of trial . . . ." *People* v. *Ladas*, supra, 12 Ill. 2d 294. The legislative and executive branches of government, which have their own considerations to balance, routinely and appropriately tweak their practices and procedures so as to best manage their affairs and conduct the business of the people. *Kitchens* is of the same ilk, and there is no reason why our commitment to maintaining stability and predictability in the law should require that, as an institution of government, we bind ourselves to unserviceable rules of procedure. Like the political branches, this court must have the freedom and flexibility not only to experiment with new procedures, but also to set such experiments aside when time and experience have proven them to be unworkable and ill conceived.

The second reason stare decisis does not require that we retain the *Kitchens* rule is because there are no reliance interests that would justify the retention of that rule in the face of its evident deficiencies. The only conceivable detrimental reliance on *Kitchens* would occur if the state, in other cases presently on appeal, had opted not to respond to appellants' unpreserved claims of instructional error on the merits and instead argued only that those claims were waived under *Kitchens*. If there are examples of this sort of reliance, any

unfairness may be remedied simply by affording the state an additional opportunity to brief the unpreserved claims on the merits (or to argue that the claims are unreviewable on a ground unrelated to the *Kitchens* rule).

Third, and most important, we are not bound to retain the *Kitchens* rule because not only was *Kitchens* wrongly decided in a such a way as to work a manifest injustice on criminal defendants whose constitutional rights have been violated and who had no intention of waiving those rights, but the rule also does irreparable damage to our broader waiver jurisprudence. As I explained in part I B of this opinion, the concept of waiver is fundamental not only in the context of criminal procedure but in virtually every area of the law. By muddying the concept in *Kitchens*, and by further confusing the issue in the present case, the majority risks infecting broad swaths of the law that rely on a clear and cogent distinction between waiver and forfeiture. Ultimately, in continuing to add epicycles to *Kitchens* in an attempt to salvage its flawed implied waiver theory, the majority itself implicitly acknowledges that the case is devoid of any precedential value.

## II

### THE DEFENDANT'S CLAIM IS UNREVIEWABLE

Applying the foregoing principles to the present case, I would conclude, contrary to the majority, that defense counsel did not implicitly waive the jury instruction claims that the defendant raises on appeal. There is absolutely no indication in the record that defense counsel was aware of the alleged errors but declined to object to them for strategic or other reasons. I agree with the defendant that there is no conceivable reason why, in a case that hinged on a contested eyewitness identification, it would have been beneficial to him not to seek a jury instruction that fully and accurately stated the considerations that might have called the reliability of the eyewitness testimony into doubt. Nor is there any indication, let alone unequivocal evidence, that defense counsel intended to waive the defendant's procedural right to raise such claims on appeal. Accordingly, the state has failed to meet its burden of proving that defense counsel, or the defendant himself, knowingly and voluntarily waived the claims at issue in this appeal.

Although I do not believe that the defendant's unpreserved jury instruction claims were waived or induced, I nevertheless agree with the state that they are unreviewable under *Golding*. The defendant's claims are that the trial court, in drafting its instructions with respect to eyewitness identification, incorporated certain of the Judicial Branch's standard criminal jury instructions that favored the state but omitted those standard instructions that would have supported a defense of misidentification. It is well established, how-

ever, that a trial court's failure to give appropriate eyewitness misidentification instructions "is at most [an instance] of instructional error rather than of constitutional error." *State* v. *Cerilli*, 222 Conn. 556, 567, 610 A.2d 1130 (1992); see also *State* v. *Dixon*, 318 Conn. 495, 501 n.3, 122 A.3d 542 (2015) (claim regarding instructions on eyewitness identification is not of constitutional magnitude). Accordingly, because *Golding* review is not available for nonconstitutional claims, I respectfully concur in the judgment.

[1] See part I A of this opinion.

[2] *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). *Golding*, which defines the conditions under which a criminal defendant may prevail on an unpreserved claim of constitutional error, represents an exception to the general rule that objections not timely raised at trial will be deemed forfeited and, therefore, unreviewable on appeal. See id., 239–40.

[3] "The distinction between a forfeiture of a right . . . and a waiver of that right . . . is that [w]hereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." (Internal quotation marks omitted.) *Mozell* v. *Commissioner of Correction*, 291 Conn. 62, 70–71, 967 A.2d 41 (2009); accord *United States* v. *Olano*, 507 U.S. 725, 733, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993). Forfeiture thus occurs as a matter of course if an objection is not timely raised, whereas waiver requires an actual informed decision not to press the right. Although we have not always used these terms with the appropriate precision, our *Golding* jurisprudence is premised on the distinction between them. Specifically, we long have held that, whereas most claims of error that are not timely raised at trial are deemed to be forfeited and, thus, not reviewable on appeal, unpreserved claims of constitutional magnitude are reviewable, assuming all of the *Golding* requirements are satisfied, unless the defendant or defense counsel voluntarily chooses to waive them. See, e.g., *Mozell* v. *Commissioner of Correction*, supra, 70–71; see also *State* v. *Davis*, 311 Conn. 468, 503–504, 88 A.3d 445 (2014) (*Palmer, J.*, concurring).

[4] See, e.g., *State* v. *Fabricatore*, 281 Conn. 469, 471, 915 A.2d 872 (2007); see also *State* v. *Charles*, 134 Conn. App. 242, 244, 39 A.3d 750, cert. denied, 304 Conn. 930, 42 A.3d 392 (2012); *State* v. *Diaz*, 109 Conn. App. 519, 535, 952 A.2d 124, cert. denied, 289 Conn. 930, 958 A.2d 161 (2008). *Fabricatore* defies easy classification. Although we began that decision by identifying the case as one of express waiver; *State* v. *Fabricatore*, supra, 471; later in the decision, we suggested that it presented a question of implied waiver; id., 478; and we also likened the claim to induced error. Id., 482–83.

[5] See, e.g., *State* v. *Hampton*, 293 Conn. 435, 445–50, 978 A.2d 1089 (2009) (defense counsel was clearly aware of defect subsequently raised on appeal when trial court twice raised with counsel question whether unanimity instruction was required); *State* v. *Whitford*, 260 Conn. 610, 631–34, 799 A.2d 1034 (2002) (challenge was waived when defense counsel raised same objection at trial and accepted trial court's curative instruction); *State* v. *Jones*, 193 Conn. 70, 85–89, 475 A.2d 1087 (1984) (challenge was waived when trial counsel excepted to charge later challenged on appeal and also participated in fashioning supplementary charge to cure error). The contention by the majority that in none of these cases was trial counsel aware of the defect that subsequently was challenged on appeal is patently false and borders on disingenuous. See footnote 27 of the majority opinion.

[6] See, e.g., *State* v. *Fuller*, 158 Conn. App. 378, 394–98, 119 A.3d 589 (2015) (defendant claimed on appeal that trial court should have given misidentification instruction, even though such instruction would have contradicted and undermined his trial theory that he was present at scene of crime but was legally in possession of allegedly stolen items); see also *United States* v. *Crowley*, 318 F.3d 401, 411 (2d Cir.) ("[the defendant's] failure even to raise the issue suggests a reasonable strategic choice that the defense was better off arguing that [he] never had a criminal intent, rather than making the argument—novel in federal law, and perhaps lacking in jury appeal—that he began with a criminal purpose but abandoned it"), cert. denied, 540 U.S. 894, 124 S. Ct. 239, 157 L. Ed. 2d 171 (2003). In arguing that reverting to the traditional, pre-*Kitchens* definition of implied waiver would "eviscerate" the concept of implied waiver; footnote 27 of the majority opinion; or narrow it to the point of abolition, the majority thus ignores the existence of cases such as *Hampton, Whitford, Jones,* and *Fuller,* each of which relied on and exemplifies the concept. See footnotes 5 and 6 of this

opinion. Of course, there will be fewer instances of implied waiver under the traditional definition than under *Kitchens'* dramatically expanded definition. But that is as it should be. In many areas of the law, we require that an individual *expressly* declare his intent to waive his fundamental constitutional rights, and, when we relax that strict requirement, we should be in no great hurry to find waiver by implication.

[7] See, e.g., *State* v. *Coward*, 292 Conn. 296, 305–306, 972 A.2d 691 (2009); *State* v. *Cruz*, 269 Conn. 97, 102, 105, 848 A.2d 445 (2004).

[8] See, e.g., *State* v. *Foster*, 293 Conn. 327, 340–42, 977 A.2d 199 (2009); *State* v. *Holness*, 289 Conn. 535, 541–45, 958 A.2d 754 (2008); *State* v. *Brewer*, 283 Conn. 352, 355, 357 n.7, 360–61, 927 A.2d 825 (2007); *State* v. *Fabricatore*, 281 Conn. 469, 475, 915 A.2d 872 (2007); see also *State* v. *Gibson*, 270 Conn. 55, 66–68, 850 A.2d 1040 (2004) (finding induced error when defense counsel declined limiting instruction offered by court). The majority contends that *Brewer* was not a case of induced or invited error but, instead, stands for a broad implied waiver rule. See footnote 13 of the majority opinion. It is clear, however, that, in *Brewer*, we relied not only on the fact that defense counsel in that case expressed satisfaction with the challenged lesser included offense instruction, but also that he specifically requested such an instruction and then verified that the instruction as given—presumably including the challenged section on unanimity—was what he had sought. See *State* v. *Brewer*, supra, 357 and n.7. For that reason, in *State* v. *Ebron*, 292 Conn. 656, 975 A.2d 17 (2009), overruled in part on other grounds by *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011), we held *Brewer* up as a case of induced error. See *State* v. *Ebron*, supra, 681 (noting that, in *Brewer*, "[the] defendant could not prevail under [the] third prong of *Golding* when he affirmatively requested exact lesser included offense instruction challenged on appeal and expressed satisfaction with that charge"). The same can be said of *Holness*, in which defense counsel requested and then specifically approved the language of the limiting instruction at issue. See id., 681.

[9] See, e.g., *State* v. *Cooper*, 38 Conn. App. 661, 670, 664 A.2d 773, cert. denied, 235 Conn. 908, 665 A.2d 903 (1995), cert. denied, 517 U.S. 1214, 116 S. Ct. 1837, 134 L. Ed. 2d 940 (1996).

[10] The majority is, therefore, incorrect when it contends that the rationales underlying the two rules are the same and that the doctrine of induced error, no less than *Kitchens'* expansive implied waiver rule, is predicated on a legal fiction. It is true that the induced error doctrine assumes that the defendant has made a strategic choice and that it holds him to the consequences of that choice. But there is no fiction therein—requesting a particular jury instruction is necessarily an exercise of trial strategy, regardless of the reason or purpose for the request—and we have made a policy determination that *Golding* review should not be available if the defendant later second-guesses that strategy and seeks to attack his own proposed instructions. The court in *Kitchens* likewise could have carved out for policy reasons a broader exception to *Golding* review for unpreserved jury instruction challenges when defense counsel merely acquiesces in the trial court's instructions. Its primary misstep was that, rather than being seen as further scaling back on *Golding* review, the *Kitchens* majority tried to piggyback on the doctrine of waiver by improperly labeling as implied waiver conduct that (1) often is not at all strategic, and (2) satisfies none of the criteria for a knowing, voluntary relinquishment of a fundamental right. The irony—and the fundamental slight-of-hand in *Kitchens*—is that it is precisely those elements of a true waiver, which exempt it from *Golding* review, that are lacking in a so-called *Kitchens* waiver.

[11] "The doctrine of judicial estoppel . . . advances notions of fair play by precluding a party from inducing judicial action by taking one legal position and then taking a contrary position later to achieve further advantage over the same adverse party." *State* v. *Hargrove*, 48 Kan. App. 2d 522, 548–49, 293 P.3d 787 (2013).

[12] See, e.g., *State* v. *Rodriguez-Roman*, 297 Conn. 66, 86, 3 A.3d 783 (2010) (unpreserved instructional claim was reviewable when "defense counsel generally acquiesced in the jury instructions but did not affirmatively request the instruction"); *State* v. *Ebron*, 292 Conn. 656, 680, 975 A.2d 17 (2009) (claim was reviewable "because the defendant, while acquiescing to the charge as given at trial, did not actively induce the trial court to act on the challenged portion of the instruction"), overruled in part by *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011); *State* v. *Madigosky*, 291 Conn. 28, 35 n.7, 966 A.2d 730 (2009) ("[t]here was no induced instructional error . . . because the defendant had not submitted a request to charge or suggested any instructional language" [internal quotation marks omitted]); *State* v. *Griggs*, 288 Conn. 116, 126–27 n.13, 951 A.2d 531 (2008) (mere acquiescence does not bar *Golding* review); see also *State* v. *Williams*, 202 Conn. 349,

363, 521 A.2d 150 (1987) ("[t]his court has consistently held that a claim that the judge improperly instructed the jury on an element of an offense is appealable even if not raised at trial").

[13] For this reason, the majority is simply incorrect when it contends that overruling *Kitchens* also would require that we overrule those decisions. Each of those decisions was properly decided under our long-standing, pre-*Kitchens* implied waiver jurisprudence.

[14] I recognize that, prior to *Kitchens*, the Appellate Court in certain instances found that unpreserved claims of jury instruction error had been waived solely on the basis of defense counsel's acquiescence in the trial court's draft charge. The Appellate Court reached that result, however, only because it, like the majority in *Kitchens*, relied on cases such as *State* v. *Cooper*, supra, 38 Conn. App. 661, without recognizing that those cases require something beyond mere acquiescence before a court may find that a defendant has waived his right to a properly instructed jury.

[15] Curiously, the majority notes that it is "not aware of any case in which a reviewing court has construed 'affirmative acceptance' as meaning passive acquiescence," and yet it declines to address any of these cases, none of which appears to contain even a whiff of affirmative acceptance.

[16] The notion that *Kitchens* cases are so fact dependent that no guidance can be provided is a red herring. In many instances, the trial court record reveals only that, when given the opportunity to object to any of the court's instructions, defense counsel merely indicates that she has no objections, that the instructions are acceptable or okay, or something to that effect. There is absolutely no reason why this court cannot and should not offer litigants and reviewing courts general guidance as to which "magic words" will result in waiver in those circumstances, and which will allow the defendant to preserve his appellate rights. See part I D of this opinion.

[17] Webster's Third New International Dictionary defines an "inference" as "the act of passing from one or more propositions, statements, or judgments *considered as true* to another *the truth of which* is believed to follow from that of the former . . . ." (Emphasis added.) Webster's Third New International Dictionary (2002) p. 1158.

[18] See, e.g., *State* v. *Kitchens*, supra, 299 Conn. 500–501 (*Katz, J.*, concurring); id., 530–32 (*Palmer, J.*, concurring); W. Horton & K. Bartschi, "2011 Appellate Review," 86 Conn. B.J. 1, 1–2 (2012); C. Ray & M. Weiner, "*State* v. *Kitchens*: The Decision Not To Decide," Connecticut Lawyer, March, 2011, p. 43.

[19] Although there are, no doubt, instances in which reliance on a legal fiction is necessary or appropriate, the court's unapologetic and inapt reliance on the concept in *Kitchens* calls to mind one well-known critique of legal fiction: "[Lawyers] feed [on] untruth, as [addicts] do [on] opium, at first from choice and with their eyes open, afterwards by habit, [until] at length they lose all shame, avow it for what it is, and swallow it with greediness, not bearing to be without it." (Internal quotation marks omitted.) L. Harmon, "Falling Off the Vine: Legal Fictions and the Doctrine of Substituted Judgment," 100 Yale L.J. 1, 3–4 (1990), quoting J. Bentham, A Comment on the Commentaries, in A Comment on the Commentaries and a Fragment on Government (1977) p. 59.

[20] I recognize that, following federal law, this court has evaluated implied waivers of a defendant's double jeopardy rights according to a different standard. See *United States* v. *Dinitz*, 424 U.S. 600, 609–10 n.11, 96 S. Ct. 1075, 47 L. Ed. 2d 267 (1976) (double jeopardy waiver need not satisfy "knowing, intelligent, and voluntary standard," by which waivers of other constitutional rights are evaluated); *State* v. *Chimenti*, 115 Conn. App. 207, 230 n.19, 972 A.2d 293 (same), cert. denied, 293 Conn. 909, 978 A.2d 1111 (2009). Several rationales have been suggested for this age-old rule: it may be assumed that a criminal defendant will have full knowledge of any previous prosecutions for the same alleged offense; see *White* v. *State*, 23 Okla. Crim. 198, 204–205, 214 P. 202 (1923); double jeopardy rights are uniquely subject to abuse and gamesmanship; see *Levin* v. *United States*, 5 F.2d 598, 600–601 (9th Cir.), cert. denied, 269 U.S. 562, 46 S. Ct. 21, 70 L. Ed. 412 (1925); *Dalton* v. *People*, 224 Ill. 333, 337–38, 79 N.E. 669 (1906); *State* v. *White*, 71 Kan. 356, 359–60, 80 P. 589 (1905); and the federal rules of criminal procedure, as well as the corresponding procedural rules of certain states, dictate that such claims are waived if not timely raised. See *United States* v. *Herzog*, 644 F.2d 713, 716 (8th Cir.), cert. denied, 451 U.S. 1018, 101 S. Ct. 3008, 69 L. Ed. 2d 390 (1981); *Ex parte Hall*, 94 N.J. Eq. 108, 119, 118 A. 347 (1922). None of those rationales applies to claims of instructional error, which, the state concedes, can be waived only on the basis of a knowing and

voluntary decision.

²¹ The majority contends that "[t]here is no such 'exchange' because waiver of the foregoing rights is within the complete control of the defendant." Footnote 15 of the majority opinion. This makes little sense. Setting aside the fact that the majority's conclusion does not flow from its premise—the blackjack player has complete control over the decision to split a pair or to double down, but there is no doubt that each involves an exchange—the majority's premise is plainly false. It will come as some news to criminal defendants, for example, that they are in complete control of the plea bargaining process.

²² I do not foreclose the possibility that, in particular cases, counsel may waive this right in order to obtain a strategic benefit. As I discuss hereinafter, I agree that the right should be deemed waived in those cases in which such a strategic choice can clearly be established.

²³ The state concedes that, in a *Kitchens* situation, the trial court asks defense counsel to make a "binding judgment" as to whether to accept the proposed instructions.

²⁴ See part I D of this opinion.

²⁵ See footnote 3 of this opinion. Although the majority in *Kitchens* purported to maintain the well established distinction between forfeiture and waiver; see *State* v. *Kitchens*, supra, 299 Conn. 474; as I previously have explained, the only reasonable reading of the *Kitchens* rule is that defense counsel, by failing to object following a review of the trial court's proposed jury instructions, *forfeits* the defendant's right to raise such challenges on appeal. See *State* v. *Davis*, supra, 311 Conn. 499 (*Palmer, J.*, concurring) (*Kitchens* is "a forfeiture case masquerading as a waiver case" [emphasis omitted]). The majority refuses to admit this obvious fact only because it will not acknowledge that *Kitchens* degraded the constitutional protections long secured by our *Golding* jurisprudence.

²⁶ The fundamental flaw in the majority's reasoning is essentially the inverse of what philosophers have termed the " 'naturalistic fallacy' "; *United States* v. *Chen*, 257 F. Supp. 2d 656, 663 n.26 (S.D.N.Y. 2003); or the mistake of assuming that because things *are* a certain way, they therefore *should be* that way. The majority makes the opposite mistake, imputing a waiver (descriptively) so as to obtain the procedural benefits of deeming an issue waived (normatively). To put it bluntly, the majority concludes that there *is* a waiver—a knowing, voluntary decision to relinquish the right to a properly instructed jury—for no reason other than that it *wants* there to be a waiver.

²⁷ See Judge Support Services, Superior Court Operations, Connecticut Judicial Branch Criminal Jury Instructions, available at http://jud.ct.gov/JI/Criminal/Criminal.pdf (last visited October 11, 2016).

²⁸ The majority accurately notes that, in *Pond*, the state, in arguing unsuccessfully that Pond's claim was unreviewable, cited induced error rather than implied waiver. The reason that the state did not also contend that Pond's claim had been waived apparently was that the trial court in that case did not hold an *on-the-record* charging conference or provide counsel with an advance copy of the charge, and thus did not satisfy the *Kitchens* criteria for implied waiver. *State* v. *Pond*, 138 Conn. App. 228, 238 n.7, 50 A.3d 950 (2012), aff'd, 315 Conn. 451, 108 A.3d 1083 (2015); see id., 237. The takeaway is that, if the trial court had dotted all of its I's and crossed all of its T's, Pond's claim likely would have been held impliedly waived under *Kitchens*, resulting in injustice to him and depriving this court of an important opportunity to clarify and develop the law on criminal conspiracy. Put differently, it is only by reviewing the results of cases in which the defendant survived *Kitchens* that we can understand the important opportunities that are lost when the *Kitchens* rule is applied to bar appellate claims of instructional error.

²⁹ See *State* v. *Johnson*, supra, 316 Conn. 48; *State* v. *Devalda*, supra, 306 Conn. 505 n.15, 506; *State* v. *Baptiste*, 302 Conn. 46, 49, 58, 23 A.3d 1233 (2011) (rejecting state's argument that defendant waived instructional claim under *Kitchens* and remanding case to Appellate Court, which subsequently found instructional error in *State* v. *Baptiste*, 133 Conn. App. 614, 628, 36 A.3d 697 [2012], appeal dismissed, 310 Conn. 790, 83 A.3d 591 [2014]); *State* v. *Brown*, 299 Conn. 640, 659–60, 11 A.3d 663 (2011); *State* v. *Opio-Oguta*, 153 Conn. App. 107, 112 n.4, 114, 100 A.3d 461, cert. denied, 314 Conn. 945, 102 A.3d 1115 (2014); *State* v. *Ruocco*, 151 Conn. App. 732, 742–44, 95 A.3d 573 (2014), aff'd, 322 Conn. 796, 144 A.3d 354 (2016); *State* v. *Antonaras*, 137 Conn. App. 703, 725–26 and n.16, 49 A.3d 783, cert. denied, 307 Conn. 936, 56 A.3d 716 (2012); see also *State* v. *Carrion*, supra, 313 Conn. 844–45,

848 (declining to address claim that Appellate Court incorrectly concluded that defendant had waived claim regarding instructional impropriety because such impropriety was harmless in any event).

[30] I am not persuaded by the state's argument that, if these rationales were compelling, they also would require the review of unpreserved claims that a defendant truly waives or induces. The rationales that I have discussed for reviewing unpreserved challenges to a jury instruction in cases in which defense counsel merely acquiesces are either muted or trumped by distinct considerations of fairness and reliance in the context of waiver or induced error. See footnotes 10 and 11 and accompanying text of this opinion.

[31] See, e.g., *State* v. *Terry*, 161 Conn. App. 797, 810–14, 128 A.3d 958 (2015) (five pages of waiver analysis), cert. denied, 320 Conn. 916, 131 A.3d 751 (2016); *State* v. *Young*, 161 Conn. App. 552, 556–63, 129 A.3d 127 (2015) (seven pages); *State* v. *Bialowas*, 160 Conn. App. 417, 426–30, 125 A.3d 642 (2015) (five pages); *State* v. *Martone*, 160 Conn. App. 315, 323–29, 125 A.3d 590 (six pages), cert. denied, 320 Conn. 904, 127 A.3d 187 (2015); *State* v. *McClain*, 154 Conn. App. 281, 289–93, 105 A.3d 924 (2014) (five pages), cert. granted, 319 Conn. 902, 122 A.3d 637 (2015); *State* v. *Charles*, 134 Conn. App. 242, 246–52, 39 A.3d 750 (six pages), cert. denied, 304 Conn. 930, 42 A.3d 392 (2012).

[32] See, e.g., *State* v. *Danforth*, 315 Conn. 518, 537, 108 A.3d 1060 (2015); *State* v. *Rabindranauth*, 140 Conn. App. 122, 129–31, 58 A.3d 361, cert. denied, 308 Conn. 921, 62 A.3d 1134 (2013); *State* v. *Hines*, 136 Conn. App. 412, 419–21, 44 A.3d 886, cert. denied, 307 Conn. 903, 53 A.3d 219 (2012); *State* v. *White*, 127 Conn. App. 846, 856–58, 17 A.3d 72, cert. denied, 302 Conn. 911, 27 A.3d 371 (2011); see also *United States* v. *Hamilton*, 499 F.3d 734, 736–37 (7th Cir. 2007) (declining to address waiver issue and proceeding not only to resolve merits of defendant's claim but also to clarify conflicting circuit precedent as to mens rea element of fraud in three paragraphs), cert. denied, 552 U.S. 1129, 128 S. Ct. 951, 169 L. Ed. 2d 782 (2008); *State* v. *Bonilla*, 317 Conn. 758, 770 n.10, 120 A.3d 481 (2015) (declining to address "intricacies" of *Kitchens* issue because merits of defendant's claim could be readily resolved).

[33] Connecticut Criminal Defense Lawyers Association, which filed an amicus brief in *State* v. *Herring*, supra, 323 Conn. 526, a companion case, cites similar statistics suggesting that the number of unpreserved claims of instructional error resulting in reversal was even lower during the sixteen years following our decision in *State* v. *Evans*, supra, 165 Conn. 61, in 1973. During that period, our appellate courts found reversible error on the basis of unpreserved claims in only 3 percent of criminal appeals. *State* v. *Golding*, Conn. Supreme Court Records & Briefs, May Term, 1989, Defendant's Supplemental Brief p. 16.

[34] In the five years preceding our decision in *Kitchens*, for example, this court and the Appellate Court found harmless unpreserved instructional error in more than one dozen cases, including *State* v. *Rodriguez-Roman*, 297 Conn. 66, 87, 3 A.3d 783 (2010), *State* v. *Hampton*, 293 Conn. 435, 462, 988 A.2d 167 (2009), *Small* v. *Commissioner of Correction*, 286 Conn. 707, 731, 946 A.2d 1203, cert. denied sub nom. *Small* v. *Lantz*, 555 U.S. 975, 129 S. Ct. 481, 172 L. Ed. 2d 336 (2008), *State* v. *Thompson*, 122 Conn. App. 20, 28, 996 A.2d 1218 (2010), aff'd, 305 Conn. 806, 48 A.3d 640 (2012), *State* v. *Nance*, 119 Conn. App. 392, 411, 413, 987 A.2d 376, cert. denied, 295 Conn. 924, 991 A.2d 569 (2010), *State* v. *Nelson*, 118 Conn. App. 831, 856, 986 A.2d 311, cert. denied, 295 Conn. 911, 989 A.2d 1074 (2010), *State* v. *Fleming*, 111 Conn. App. 337, 352–53, 356, 958 A.2d 1271 (2008), cert. denied, 290 Conn. 903, 962 A.2d 794 (2009), *State* v. *Haywood*, 109 Conn. App. 460, 471, 952 A.2d 84, cert. denied, 289 Conn. 928, 958 A.2d 161 (2008), *State* v. *Tok*, 107 Conn. App. 241, 274, 945 A.2d 558, cert. denied, 287 Conn. 919, 951 A.2d 571 (2008), and cert. denied sub nom. *State* v. *Jourdain*, 287 Conn. 920, 951 A.2d 570 (2008), *State* v. *Lawson*, 99 Conn. App. 233, 245, 913 A.2d 494, cert. denied, 282 Conn. 901, 918 A.2d 888 (2007), *State* v. *Rivet*, 99 Conn. App. 230, 233, 912 A.2d 1103, cert. denied, 281 Conn. 923, 918 A.2d 274 (2007), *State* v. *Youngs*, 97 Conn. App. 348, 362, 904 A.2d 1240, cert. denied, 280 Conn. 930, 909 A.2d 959 (2006), and *State* v. *McArthur*, 96 Conn. App. 155, 181–83, 899 A.2d 691, cert. denied, 280 Conn. 908, 907 A.2d 93 (2006).

[35] It would be disturbing indeed if the majority, having rejected the "cynical" view that a state's attorney might allow an instructional error to go unnoticed in order to obtain a strategic advantage; footnote 18 of the majority opinion; were to adopt an equally cynical presumption regarding the conduct of defense counsel.

[36] If the majority is truly concerned that many unpreserved claims of

instructional error are the result of secret strategic plans that are not apparent from the trial court record, then those concerns easily can be addressed simply by requiring that appeals alleging instructional error be accompanied by an affidavit by trial counsel stating that she was unaware of the alleged defects at the time of trial and that the defendant did not intend to waive any objections thereto. Cf. General Statutes § 52-190a (a) (attorney filing medical malpractice action must attach certificate stating that reasonable inquiry gave rise to good faith belief that grounds exist for action against each defendant). In the event that the state had cause to question the veracity of such a representation, the matter could be remanded to the trial court to make the necessary findings. See Practice Book § 60-2 (9); see also *Henry* v. *Mississippi*, 379 U.S. 443, 449–53, 85 S. Ct. 564, 13 L. Ed. 2d 408 (1965). Such a procedure would allow any necessary factual determinations to be made by the court that tried the case, which is in the best position to assess whether the decisions of counsel were intentional and strategic, and dispense with the need for this court to engage in fact-finding functions for which it is ill-suited, or for a second, costly trial before a habeas court. And it would ensure that criminal defendants are not unfairly deprived of their constitutional right to a properly instructed jury solely on the basis of a presumption with little basis in reality regarding an error for which the defendant himself is almost certainly blameless. See *State* v. *Hargrove*, 48 Kan. App. 2d 522, 551–53, 293 P.3d 787 (2013).

[37] It bears noting that, whereas the rules of practice governing jury trials expressly inform the defendant that he may be deemed to have waived the right to a jury trial if he fails to make a timely election; Practice Book § 42-1; there is no corresponding waiver provision in the rules governing jury instructions.

[38] It bears emphasizing in this respect that *Golding* itself was an instructional error case, and the *Golding* test clearly was intended from the outset to govern such claims. See *State* v. *Golding*, supra, 213 Conn. 235. Moreover, I am not persuaded by the state's argument that *Golding* predated the era of in-depth charging conferences and, therefore, did not account for the importance of encouraging full participation in such conferences by both parties. In fact, our cases from that time period reflect that we recognized both the existence and the importance of collaborative charging conferences but that we placed a higher priority on ensuring that unwaived constitutional violations did not go unaddressed. See, e.g., *State* v. *Sirimanochanh*, 224 Conn. 656, 660–64, 620 A.2d 761 (1993); *State* v. *Famiglietti*, 219 Conn. 605, 618–19, 595 A.2d 306 (1991).

[39] See *State* v. *Beebe*, 131 Conn. App. 485, 492–93, 27 A.3d 26 (2011), cert. denied, 303 Conn. 921, 34 A.3d 397 (2012); *State* v. *Brown*, 131 Conn. App. 275, 282, 26 A.3d 674 (2011), aff'd, 309 Conn. 469, 72 A.3d 48 (2013); *State* v. *Myers*, 129 Conn. App. 499, 510, 21 A.3d 499, cert. denied, 302 Conn. 918, 27 A.3d 370 (2011); *State* v. *Bharrat*, 129 Conn. App. 1, 18–19, 20 A.3d 9, cert. denied, 302 Conn. 905, 23 A.3d 1243 (2011); *State* v. *Lahai*, 128 Conn. App. 448, 460, 18 A.3d 630, cert. denied, 301 Conn. 934, 23 A.3d 727 (2011); *State* v. *Carrion*, 128 Conn. App. 46, 60, 16 A.3d 1232 (2011), aff'd, 313 Conn. 823, 100 A.3d 361 (2014).

[40] See *Carrion* v. *Warden*, Superior Court, judicial district of Tolland, Docket No. TSR-CV-11-4004163-S (December 15, 2015); *Bharrat* v. *Commissioner of Correction*, Superior Court, judicial district of Tolland, Docket No. TSR-CV-12-4004615-S (August 27, 2014), appeal dismissed, 167 Conn. App. 158, 143 A.3d 1106 (2016); *Lahai* v. *Warden*, Superior Court, judicial district of Tolland, Docket No. TSR-CV-09-4003028-S (May 7, 2012); *Myers* v. *Warden*, Superior Court, judicial district of Tolland, Docket No. TSR-CV-14-4005938-S (withdrawn August 12, 2016). I focus on cases decided in the immediate wake of the *Kitchens* decision because we will not know for some period of time whether more recently decided *Kitchens* cases ultimately will result in habeas challenges.

[41] The majority contends that, in *Lahai*, the Appellate Court "cited *Kitchens* only for its passing reference to the doctrine of induced error, and not for its clarification of the implied waiver rule." This is plainly false. Although it is true that the Appellate Court concluded that Lahai had induced the challenged error; see *State* v. *Lahai*, supra, 128 Conn. App. 457; that court also expressly discussed *Kitchens*' clarification of the implied waiver rule and independently found that the instructional challenge at issue was impliedly waived under *Kitchens*. Id., 459–60.

[42] Although I largely agree with the concurring opinion of Chief Justice Rogers, I do not share her view that "specific, on-the-record discussion of *the particular instruction* later claimed to be defective on appeal," followed

by defense counsel's explicit assent to that instruction, is sufficient to establish waiver by implication of the defendant's constitutional right to a properly instructed jury. (Emphasis in original.) Text accompanying footnote 10 of Chief Justice Rogers' concurring opinion. As I explained in this opinion, I would find waiver only when the well established criteria for waiver are actually satisfied. Although I understand that certain federal courts follow an approach similar to that advocated by Chief Justice Rogers, I do not believe that that approach ever has been the law of this state.